In case no. 1031030, the City of Birmingham appeals from a judgment entered in *Page 20 
favor of Unus Properties, LLC. In that action, the trial court entered a judgment reversing the denial by the Birmingham City Council of Unus's petition to rezone certain property and ordering that the property be rezoned from "R-3" (single-family residential) to "Q-O I" (qualified office and institution). In case no. 1030926, Dr. Andrew E. Pollard, Margaret Cameron Gaede, Joseph Preston, and Andrea L. Preston (hereinafter referred to collectively as "the property owners") appeal from the same judgment.[1] We reverse the judgment of the trial court.
 Facts
This zoning case centers around property located at 2800 Highland Court South, which is a residence referred to as "the Morrow House." The Morrow House is located in the historic Highland Park neighborhood of Birmingham; the Morrow House is approximately 94-95 years old and, along with many other buildings in the neighborhood, is listed on the National Register of Historic Places by the United States Department of the Interior. As of 1990 and at all times relevant to this litigation, the Morrow House was subject to a zoning classification of "R-3," which allows only single-family residential structures.[2]
 Background of Southside Area of Birmingham, Including the Highland Park Neighborhood
In the 1960s and 1970s, the City of Birmingham experienced a significant growth in population, particularly in the area known as "Southside." To accommodate this growth and to encourage developers to renovate the aging Southside, Birmingham modified the zoning classifications applicable to the Southside area to allow for more "intense" uses. This included changing many areas classified as single-family residential to multiple-family residential and allowing commercial, office, and institutional uses alongside residential uses. These changes resulted in significant land-use modifications. These changes resulted in neighborhoods in which apartments and townhouses and commercial and business uses mixed with single-family residences and created sprawling multi-family buildings and parking, drainage, and traffic problems. According to one city planner for Birmingham, "[I]t appeared that the effort to restore the city that had been contemplated in the '60s had substantially backfired and the opposite effect was true."
In 1990, city planners for Birmingham reviewed neighborhood demographics, trends, and then current land uses. The City also held numerous public meetings and hearings. The information gathered by the City indicated that residents of the Highland Park neighborhood strongly desired to emphasize the single-family residential character of the neighborhood and to discourage any further business or commercial *Page 21 
encroachment into the neighborhood. Additionally, Birmingham was losing many of its single-family residents to surrounding municipalities; Birmingham wanted to retain those residential landowners it had and to attract more residential landowners to its neighborhoods.
In order to emphasize the residential character of its neighborhoods and to retain and attract residential landowners, Birmingham adopted a long-range-use plan, stepping back from the higher intensity land use the City had allowed in the 1960s and 1970s. The land-use plan recommended that much of the property in the Highland Park neighborhood be reduced from the more intense high-density, multi-family uses to less intense, medium- to low-density uses. The City of Birmingham adopted the proposed land-use plan in 1990, and, thereafter, much of Southside, including the Highland Park neighborhood, was rezoned in conformity with this land-use plan. Although many of the earlier multi-family and business uses still existed in the newly restricted areas, they were allowed as preexisting nonconforming uses and were "grandfathered" in under the 1990 land-use plan. The zoning of the subject property — the block in which the Morrow House is located — was changed at that time to R-3, single-family residential. The zoning for that area has remained R-3 to this date.
 Unus's Purchase of the Morrow House
In June 2000, Unus entered into a contract to purchase the Morrow House. Stephen Chazen, a principal in Unus, acknowledged that he was aware when Unus purchased the property that the Morrow House was located in an area zoned R-3. In fact, the purchase contract was made contingent upon "Purchaser [Unus] receiving acceptable zoning or variance for use as an office by a private foundation." The closing occurred on August 1, 2000; at that time, Unus voluntarily waived that contingency and struck the contingent language from the contract.
Although Unus did not obtain a zoning variance or seek a change in zoning, shortly after taking possession of the property, it began using the Morrow House as office space.[3] In November 2000, the City of Birmingham cited Unus for violating the R-3 zoning classification by operating a business in a property zoned for single-family residential. On December 18, 2000, Unus petitioned the City of Birmingham to rezone the property from R-3 to Q-O I.
Unus's petition was first submitted to the Highland Park Neighborhood Association. The Highland Park Neighborhood Association voted unanimously to oppose rezoning the property. The petition to rezone was next presented to Birmingham's zoning advisory committee. After a hearing, two members of the zoning advisory committee voted against the petition and two members abstained from voting. The petition was then submitted to the Birmingham City Council for consideration.[4]
On September 25, 2001, and again on October 2, 2001, the Birmingham City Council held public hearings to address Unus's petition to rezone the property. On October 2, 2001, the city council voted 6-0 to deny the petition. On that same day, Unus sued the City of Birmingham in *Page 22 
the Jefferson Circuit Court, claiming, among other things, that the denial of its petition to rezone the Morrow House bore no relation to the health, safety, morals, and general welfare of the inhabitants of Birmingham and that the council's decision was arbitrary and capricious, violated Unus's procedural and substantive due-process rights,[5] denied Unus the legitimate and legal right to the use of its property, and violated the property rights of Unus as established by Alabama law.[6] Unus requested that the trial court order the City to rezone the Morrow House from R-3 to Q-O I; that, pending the resolution of this action, the trial court enter a preliminary injunction preventing the City of Birmingham from interfering with Unus's continued occupancy and use of the Morrow House; and that the trial court permanently enjoin the City of Birmingham from interfering with the use of the property for any use permitted under the requested rezoning classification. Unus also sought damages. Shortly thereafter, the property owners were allowed to intervene in the action, pursuant to Rule 24, Ala. R. Civ. P.
The trial court conducted a bench trial on October 13 and 14, 2003. Both Unus and the City of Birmingham presented expert witnesses in support of their respective positions on the rezoning petition. Residents from the Highland Park neighborhood also testified against the rezoning petition. The trial judge toured the Morrow House, observed the surrounding neighborhood, and visited two other historic residences in the Highland Park neighborhood.
On March 4, 2004, the trial court entered its final judgment. In its order, the trial court found that the Morrow House was located in a neighborhood that had for many years been classified for mixed use. The trial court noted that nonresidential uses located in the same neighborhood as the Morrow House included churches, a park, a law office, a Planned Parenthood office, a bookstore, and the Donnelly House (a residence that housed a business engaged in the business of hosting weddings and other social gatherings). The trial court observed that the Morrow House faced Rhodes Park, around which many of these nonresidential uses were located. The trial court also noted that the proximity of the Morrow House to deteriorating apartments made it less appealing as a single-family residence, that the level of preservation of the Morrow House would be higher if the petition to rezone was granted, and that, if the petition was not granted, the Morrow House might meet the same fate as other residences in the area — deteriorating or being subdivided into apartments. The trial court concluded that the lot on which the Morrow House was located should not have been zoned R-3 in 1990 and that granting the rezoning Unus was requesting would not cause any harm to the health, safety, morals, or general welfare of the community and would indeed contribute to the preservation of the Morrow House. The trial court also concluded that, if properly limited, the requested rezoning would not detract from the attractiveness of the Highland Park neighborhood "as a place for people to live" and that there was no evidence indicating "that the difference between 10 employees and 4 employees would affect any property owner or the neighborhood." *Page 23 
The trial court concluded that the denial of the requested rezoning by the Birmingham City Council lacked a substantial relationship to the public health, safety, morals, and welfare of the community. The trial court also concluded that the city council's denial of the petition to rezone was not fairly debatable and that the petition should have been granted; additionally, the court concluded that the Birmingham City Council's refusal to rezone the Morrow House was clearly arbitrary and unreasonable. The trial court ordered that the Birmingham City Council grant Unus's petition to rezone the property from R-3 to Q-O I, subject to the qualifications and limitations enumerated by the trial court.[7]
The City of Birmingham appeals; the property owners appeal separately.
 Standard of Review and Applicable Standards
The trial court's order was the result of a two-day bench trial, at which the court heard ore tenus evidence. "Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence." AmericanPetroleum Equip. Constr., Inc. v. Fancher, 708 So.2d 129, 132
(Ala. 1997). However, in its order of March 4, 2004, the trial court noted that few issues of fact were disputed. The court stated that "[t]he real question is what legal conclusions the court should draw from those facts." "[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. In addition, theore tenus presumption of correctness has no application to a trial court's conclusions on questions of law." AmericanPetroleum, 708 So.2d at 132 (citations omitted).
 Analysis
"It is settled law that the Alabama Legislature has delegated to municipal legislative bodies, such as city councils, the power and authority to enact zoning ordinances." American Petroleum,708 So.2d at 131; see also § 11-52-76, Ala. Code 1975 ("The legislative body of [the] municipality shall provide for the manner in which such [zoning] regulations and restrictions and the boundaries of such districts shall be determined, established and enforced and from time to time amended, supplemented or changed."). This Court has recognized:
 "The authority for zoning laws is found within the bounds of the police power, asserted for the public welfare, and it has been well said that the line in this field which separates the legitimate from the illegitimate assumption of power is incapable of precise delimitation, varying with circumstances and conditions. . . .
 "The cases, of course, recognize the rule that the lawmaking authorities may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities; that governmental interference by zoning ordinances with such use, is not unlimited, and such restrictions *Page 24 
should bear some substantial relation to the public health, safety, morals, or general welfare, or as otherwise elsewhere expressed, the `public convenience or the general prosperity.'"
Leary v. Adams, 226 Ala. 472, 474, 147 So. 391, 392 (1933) (citations omitted).
It is also well-settled that the courts must apply a highly deferential standard in reviewing zoning decisions. See, e.g.,American Petroleum, 708 So.2d at 133; City of Mobile v.Karagan, 476 So.2d 60, 63 (Ala. 1985); Episcopal Found. ofJefferson County v. Williams, 281 Ala. 363, 202 So.2d 726
(1967). "[P]assage of a zoning ordinance is a legislative act, and it is well established that municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable." Cudd v. City of Homewood, 284 Ala. 268, 270,224 So.2d 625, 627 (1969).
In Homewood Citizens Association v. City of Homewood,548 So.2d 142 (Ala. 1989), this Court stated:
 "When a municipal body acts either to adopt or to amend a zoning ordinance, it acts in a legislative capacity and the scope of judicial review of such action is quite restricted. The restricted role in reviewing the validity of a zoning ordinance or regulation has been stated as follows:
 "`Zoning is a legislative matter, and, as a general proposition, the exercise of the zoning power should not be subjected to judicial interference unless clearly necessary. In enacting or amending zoning legislation, the local authorities are vested with broad discretion, and, in cases where the validity of a zoning ordinance is fairly debatable, the court cannot substitute its judgment for that of the legislative authority. If there is a rational and justifiable basis for the enactment and it does not violate any state statute or positive constitutional guaranty, the wisdom of the zoning regulation is a matter exclusively for legislative determination.
 "`In accordance with these principles, it has been stated that the courts should not interfere with the exercise of the zoning power and hold a zoning enactment invalid, unless the enactment, in whole or in relation to any particular property, is shown to be clearly arbitrary, capricious, or unreasonable, having no substantial relation to the public health, safety, or welfare, or . . . plainly contrary to the zoning laws.'"
548 So.2d at 143 (quoting 82 Am.Jur.2d Zoning and Planning § 338 (1976) (citations omitted)).[8] The Court in HomewoodCitizens Association also stated:
 "`If the adoption of the ordinance raises questions upon which reasonable differences may exist in view of all the circumstances, and the wisdom of the ordinance is fairly debatable, then the action of the municipal governing body in adopting the ordinance will not be deemed arbitrary, a court being unwilling under such circumstances to substitute its judgment for that of the municipal governing body acting in a legislative capacity.'"
548 So.2d at 143-44 (quoting City of Tuscaloosa v. Bryan,505 So.2d 330, 336 (Ala. *Page 25 
1987)).[9] See also American Petroleum, 708 So.2d at 131
(quoting Davis v. Sails, 318 So.2d 214, 217 (Fla.Dist.Ct.App. 1975)) ("`[I]f the application of a zoning classification to a specific parcel of property is reasonably subject to disagreement, that is, if its application is fairly debatable, then the application of the ordinance by the zoning authority should not be disturbed by the courts.'").
In the briefs filed with this Court, the parties discuss at length whether the appropriate standard to be applied in this case is (1) the "substantial relationship rule" and the "fairly debatable rule," as two separate prongs, or (2) only the "fairly debatable rule" as a single prong when an ordinance is being applied to a specific parcel of property. Authority appears to exist for both the one-pronged approach and the two-pronged approach; compare H.H.B., L.L.C. v. D F, L.L.C.,843 So.2d 116 (Ala. 2002) (per curiam) (discussing the substantial-relationship rule and the fairly debatable rule as one prong, when a zoning ordinance is being applied to a specific parcel of property), with BP Oil Co. v. Jefferson County,571 So.2d 1026 (Ala. 1990) (recognizing that the substantial-relationship rule and the fairly debatable rule are two separate considerations). In this case our result would be the same under either approach; therefore, we need not resolve the parties' debate on this issue.
We first address whether the R-3 zoning of the Morrow House property in 1990 and the subsequent denial of the request to rezone that property bore a substantial relationship to the health, safety, morals, and welfare of the community. If so, we must then address whether the city council's denial of the petition to rezone the subject property from R-3 to Q-O I was fairly debatable. If the denial was fairly debatable, our inquiry ends and we must reverse the trial court's judgment.
We conclude that the zoning of the Morrow House as R-3 pursuant to the 1990 land-use plan and the subsequent denial to rezone that property for business use was substantially related to the health, safety, morals, and general welfare of the community; we also conclude that the denial of Unus's petition to rezone the subject property was fairly debatable.
 Adoption of the 1990 Land-Use Plan and the Ordinance Zoning the Morrow House as R-3
Tom Magee, the chief planner in the City of Birmingham's Department of Planning, Engineering, and Permits, testified at the trial regarding the land-use plan and the zoning ordinances adopted in 1990.[10] Magee testified:
 "[W]hen I was employed here, one of the first things that the mayor of the City of Birmingham told me was that what he wanted to do was to update our comprehensive plan, because we had neighborhoods that were complaining about the downgrading, if you will — the decline of the single-family residential areas. We had neighborhoods coming to the mayor's office and actually requesting . . . but requesting the mayor to ask the planning department to look at the zoning and the land use. The land use had *Page 26 
not been updated in 1988 since 1960. The zoning had not been updated since 1960. . . . And we began the process. We divided the city up in sectors. We began the process of looking at the land use and zoning and making recommendations. And we methodically went around the city and changed the zoning in a lot of areas. We downzoned a lot of property.
". . . .
 "Well, for one, we did — we heard — and this was a constant reply from not just the Highland Park neighborhood and the Southside neighborhoods, but others too — we don't want any more apartments. But the theme though was we want to maintain the single-family integrity of our neighborhood. We want to recapture the single-family integrity by downzoning that property to allow property owners to take a little bit more pride in their property and bring that neighborhood character back."
Magee also testified:
 "I had staff actually involved in this process looking at the existing traffic patterns for the neighborhoods that were involved in the sector plan, looking at the demographic information and housing information, looking at it at different environmental considerations, taking all of that information and evaluating it, meeting with the neighborhoods and getting their input into the process — in fact, meeting several times with the neighborhoods and neighborhood groups, meeting with merchant groups and other stakeholders in the neighborhoods, and taking that information. Once we compiled it and put it into map form and other forms of presentation, then we had public hearings. Once we had our public hearings — we had two — we had more than one public hearing, because a couple of them lasted longer than one public hearing. We had public hearings with the planning commission to evaluate the land use and the zoning and then the city council ultimately adopted the zoning part, but the planning commission adopted the land-use part.
". . . .
 "And that was part of the process — was looking at existing land use. We actually took base maps and drove up just about every street in every neighborhood looking at existing conditions, looking at existing land use, existing housing conditions, looking at existing zoning — how it was zoned currently and — or at the time, and then taking existing conditions, the existing travel patterns, demographic information, and putting that into map form."
Magee testified that the City learned that, although zoned for higher density uses, many areas of the Highland Park neighborhood were being used for lesser density purposes. He also stated: "Recognizing that and also recognizing the goal of the neighborhood being to preserve the neighborhood's integrity, which was one of their stated goals — to preserve the residential character of the neighborhood, it was — we did — we recommended a lot of downzoning for the [Highland Park] neighborhood."[11] *Page 27 
Magee testified that, in drafting the proposed land-use plan, his office relied on the land-use plan developed in the 1970s, on population and housing characteristics of the neighborhoods, census data, building-permit information and projected population trends through 2010, existing land-use and zoning information, socioeconomic data, environmental and historical data, the street plan and traffic patterns applicable to the area and the desires of the residential and business communities in the area. The proposed land-use plan was then discussed at neighborhood meetings and at public hearings. Magee testified that, after several modifications, the City of Birmingham adopted the land-use plan in 1990.[12] The land-use plan specified low-density residential use for the Morrow House. The city council adopted an R-3 classification for the Morrow House.
As noted in the studies performed before the adoption of the 1990 land-use plan, the Southside area, including the Highland Park neighborhood, contained residential uses and higher density uses. Those higher density uses — apartments, townhouses, a law firm, the Donnelly House, the bookstore — continued to exist; they were grandfathered into the zoning ordinances enacted as a result of the 1990 land-use plan. However, the City adopted lower density classifications such as R-3 with the goal of limiting additional higher density uses from coming into the Highland Park neighborhood. The record indicates that, since the 1990 amendments to the zoning ordinances, the city council has not approved any nonconforming uses in the areas around the Morrow House.
We conclude that this evidence amply establishes that the city council's adoption in 1990 of the single-family residential zoning classification was not arbitrary and capricious. The purposes for which the R-3 zoning was adopted were substantially related to the health, safety, morals, and general welfare of the community. The trial court's finding of fact that the lot on which the Morrow House is located should not have been zoned R-3 in 1990 was clearly erroneous.
 The City Council's Denial of the Request to Rezone the Morrow House
The evidence reflects that the following factors were considered by the various City entities in determining whether to grant Unus's request to rezone the Morrow House: the 1990 land-use plan; the existing zoning classification applicable to the Morrow House; the existing conditions surrounding the property; the current and past uses to which the Morrow House had *Page 28 
been put; and the unanimous vote by the members of the Highland Park Neighborhood Association (93-0) against the request to rezone the Morrow House. Magee testified that, upon consideration of these factors, he prepared a report recommending that the zoning advisory committee deny the rezoning request "[a]s this location is surrounded by low-density residential uses (amidst an intact residential neighborhood), and [the zoning change] would be out of character with the current Long Range Land Use Plan." This recommendation was considered in conjunction with comments and statements made by interested parties at public hearings held on the rezoning request. The city council voted 6-0 against the request to rezone the subject property.
We find nothing arbitrary, capricious, or unreasonable in the city council's denial of the rezoning request. It is without question that Unus's rezoning request — to change the zoning classification of the Morrow House from low-density residential use to one allowing office and institutional use — invokes the "police powers" granted to the Birmingham City Council, i.e., the power to enact and amend zoning ordinances. The city council investigated the request and conducted public hearings on the matter. In evaluating the request to rezone, the city council was required to balance Unus's property interests against nuanced issues such as (1) how to preserve the residential nature of the Highland Park neighborhood and the residential appearance of the Morrow House itself, (2) how the proposed rezoning would impact the long-range-use plan for the Highland Park neighborhood, (3) the interests of the neighboring property owners, (4) the extent of the neighborhood's opposition to the proposed use of the Morrow House, (5) how the City's parking requirements for business and commercial use would impact the neighborhood if the request to rezone was granted, and (6) what precedent would be set if the request to rezone was granted.[13] These issues properly fall within the categories of health, safety, morals, and general welfare of the community. The city council resolved these issues by denying Unus's request to rezone the property. Therefore, the denial of Unus's request to rezone was substantially related to the health, safety, morals, and general welfare of the community.
Additionally, the trial court's conclusion that the city council acted arbitrarily and capriciously by denying Unus's request to rezone because other nonresidential uses were located in the same neighborhood was erroneous. The City of Birmingham presented evidence establishing that, in 1990, the zoning classification for the area was changed to R-3 but that the higher density uses that existed at the time of the zoning change were allowed to continue. However, the long-range land-use plan for the area specified that no new commercial or business uses would be allowed. Unus did not establish that, since 1990, the Birmingham City Council has granted a zoning request to allow a higher density use under the existing R-3 zoning classification; to the contrary, the City of Birmingham offered evidence indicating that no new commercial use, business use, or multi-family use has been allowed in the Highland Park area since the land-use plan was adopted in 1990. Thus, there was no evidence to support any inference that the city council denied Unus's request arbitrarily. The denial of Unus's request to *Page 29 
rezone the subject property was consistent with the City's 1990 land-use plan.
Moreover, applying the "fairly debatable rule" to this decision, it is clear that reasonable persons could disagree as to whether the city council made a wise or correct decision. Even Chazen acknowledged at trial that whether the Morrow House should be rezoned in the manner requested by Unus had been the subject of "passionate debate." Although the trial court obviously found reasons to disagree with the city council's decision, it is not the province of the court to substitute its judgment for that of a legislative body vested with the power to make such decisions. We find language from Episcopal Foundation of Jefferson Countyv. Williams, supra, especially applicable:
 "While the court is given the power to review the validity vel non of an ordinance or other legislative act, it is not given the power to review the wisdom or unwisdom, or the rightness or wrongness of laws passed by the legislative power delegated to the City Council or the City of Birmingham, or like bodies. . . .
 "`Every intendment is to be made in favor of the zoning ordinance and the matter was largely in the legislative discretion of the municipal authorities. . . . Here, the city Commission is acting in the exercise of a legislative function and with a wide degree of discretion.' . . .
 "In the instant case, the City Council of the City of Birmingham, although without recommendation of the Zoning Advisory Committee, in our judgment, acted within constitutional bounds and did not take arbitrary, unreasonable or unlawful action. The Council had a superior opportunity to know and consider varied conflicting interests involved, to balance the burdens and the benefits, and to consider the general welfare of the area involved. There was procedural compliance with the requirement for a public hearing.
 "The courts should be slow to set up their own opinions as against those charged with and in position rightfully to perform such duty. The fact that the complainants (appellees) may suffer some financial loss and depreciation in the value of their property is not a test of the constitutionality of the zoning ordinance; nor is it a test to determine if the zoning ordinance is arbitrary, capricious, inequitable and discriminatory. . . .
 "The question is whether the reclassification of [the property at issue] is sound and fair. If the question is fairly debatable, the court will not substitute its judgment for that of the City Council of Birmingham in the exercise of its legislative power. . . .
 "The duties of the local authorities in Birmingham, charged with zoning property, are evidently arduous and of a delicate character, requiring sensitive insight and perspicuity as to the public health, safety, morals and general welfare incident to zoning. We cannot say that their judgment is always free from error, but before the courts will interfere, it must be made to appear that such an ordinance passes the bounds of reason and assumes the character of a merely arbitrary fiat.
 "We think that men may reasonably differ as to the advisability of a zoning change or in a change affecting zoning districts. We are unwilling in the instant case to substitute our opinion for that of the City Council upon whom the responsibility of weighing all factors devolved, and who had access to full information and acted accordingly. We have no reason to say that the City Counsel [sic] did not act with enlightened judgment *Page 30 
in consideration of the ordinance here under attack."
281 Ala. at 367, 202 So.2d at 729-30.
In this case, we see no basis to disturb the decision of the Birmingham City Council, a duly elected body, vested with the proper authority, which, after obtaining full information, weighed the appropriate factors. That legislative body acted in accordance with its powers and discretion.
We reverse the judgment of the trial court; we remand this cause to the trial court for the entry of a judgment in favor of the City of Birmingham and the property owners.
1030926 — REVERSED AND REMANDED WITH DIRECTIONS.
1031030 — REVERSED AND REMANDED WITH DIRECTIONS.
NABERS, C.J., and BROWN and HARWOOD, JJ., concur.
SEE, J., concurs specially.
[1] We discuss case no. 1031030 first because it involves the two primary parties to this action and was the main action before the trial court. Case no. 1030926 involves the intervenors in the action below; however, they filed their notice of appeal before the City of Birmingham and consequently received an earlier case number.
[2] Rhodes Park is located directly across from the front of the Morrow House. The Highland Park Neighborhood Association has made large financial contributions for the purpose of maintaining and renovating this park. An apartment building (multiple-family residences) is located behind the Morrow House. Although this multiple-family structure is located in the same block as the Morrow House, it preexists the R-3 classification and was therefore "grandfathered" into the 1990 zoning ordinance. Townhouses (attached single-family residences) are located on the west side of the Morrow House, across a narrow street. Immediately to the east/northeast of the Morrow House are other single-family residences.
[3] Unus purchased the property strictly for office use; Chazen testified that he never intended to use the Morrow House as a residence.
[4] Because the rezoning request did not receive a majority vote either for or against the request to rezone, the request was submitted to the Birmingham City Council without a recommendation from the zoning advisory committee.
[5] Pursuant to § 6-6-227, Ala. Code 1975, the attorney general was served in this action. The attorney general's office responded with an acceptance and a waiver of further service.
[6] Unus included other claims in its complaint. Those claims were dismissed or withdrawn before the trial in this case.
[7] Those qualifications and limitations were stated in the trial court's order. The trial court acknowledged that the stated qualifications and limitations did not ordinarily apply to office and institutional zoning classifications. In addition, the City of Birmingham required all properties in O I zoning classifications to provide adequate parking. In order to comply with the City's mandatory parking requirements, the Morrow House would have been required to provide 23 parking spaces adjacent to the Morrow House.
[8] In Ex parte City of Jacksonville, 693 So.2d 465, 468
(Ala. 1996), this Court recognized that a citizen challenging a zoning ordinance bore the burden of proving that the ordinance was arbitrary and capricious.
[9] The Court in Homewood Citizens Association further stated: "The burden is upon the party seeking relief from an ordinance to show that the ordinance was not a fairly debatable issue before the municipal governing body." 548 So.2d at 144.
[10] During his employment with the City of Birmingham, Magee was responsible for supervising the preparation and updating of the Birmingham comprehensive master land-use plan; he also served as the technical staff advisor to the Birmingham Planning Commission and the Zoning Board of Adjustment.
[11] The record also contains the testimony of Kenneth Groves, a city planner who testified as an expert on behalf of the City of Birmingham and who participated in the land-use planning for Birmingham. Grove participated in a revitalization study of the Southside area during the years of 1975 to 1977. According to Grove, the study focused on Birmingham's zoning history dating from 1960. Grove testified that as a result of the study, the City of Birmingham concluded that the actual land use in the area had undergone rapid changes in the 1960s and early 1970s and that those changes had not been beneficial to certain areas of Birmingham, including Highland Park. A long-range land-use plan was prepared with the goal of reversing the undesirable urbanization that had occurred in certain areas of Birmingham as a result of rapidly changing, yet largely uncontrolled, land uses.
Grove testified:
 "[T]here were enclaves of single-family residential homes that wanted to preserve their lifestyle. They liked living on the Southside and that convenience. And this began through those '70s and the early '80s, and it continues on even to this day, an effort to stabilize the Southside neighborhoods and to sort out the uses. . . . [T]he plan was prepared that drew a line for [the University of Alabama at Birmingham] expansion into the Five Points South neighborhood that showed where commercial and office were appropriate and where single-family residences would be protected."
Grove testified that "there were provisions for general reductions of density, and sorting out of the land uses did occur. And the concept of restoring or protecting the single-family neighborhoods was introduced into the area then in 19 — that would be in about the '77 era."
[12] By October 1992, the City of Birmingham had adopted all of the components of the long-range land-use plan.
[13] We point out that Unus purchased and renovated the Morrow House with full knowledge that it was zoned as R-3. That R-3 zoning had not been amended for some 10 years before Unus purchased the Morrow House.