BRYAN, Judge.
M.H. (“the father”) appeals from a judgment entered by the Walker Juvenile Court (“the juvenile court”) that awarded custody of his daughter, M.J.H. (“the child”), to H.N.M., the child’s maternal aunt (“the maternal aunt”). In M.H. v. H.N.M., 46 So.3d 967 (Ala.Civ.App.2009), this court dismissed the father’s initial appeal in this matter after we concluded that the judgment was nonfinal because the juvenile court had failed to rule on the father’s request for visitation with the child. After this court dismissed the father’s appeal, the juvenile court entered an order that was identical to the initial order awarding custody of the child to the maternal aunt except that it also awarded the father visitation with the child every other weekend of each month and at any additional times to which the parties agreed.
A summary of the procedural history of this case can be found in M.H. v. H.N.M., supra; therefore, we will not discuss it in detail here. However, we will briefly ad *401 dress the juvenile court’s jurisdiction to determine the custody of the child. This proceeding was initiated by the maternal aunt in December 2007 when she filed a petition for custody of the child because the whereabouts of E.D., the mother of the child (“the mother”), were unknown. The record indicates that the maternal aunt’s December 2007 petition for custody was the second proceeding presented to the juvenile court regarding the child’s custody. In May 2005, an emergency petition for custody was filed by the father’s cousin, and the father’s cousin was apparently awarded pendente lite custody of the child at that time. However, after a trial, the juvenile court awarded custody of the child to the mother in August 2006.[1] Because the record indicates that the juvenile court had previously decided the issue of custody of the child, former § 12-15-82, Ala.Code 1975, which was applicable at the time the maternal aunt filed her petition for custody of the child, applies.[2] Former § 12-15-32(a) provided, in pertinent part: “[Jjuris-diction obtained by the juvenile court in any case of a child shall be retained by it until the child becomes 21 years of age unless terminated prior thereto by order of the judge of the juvenile court....” Accordingly, because there is no indication in the record that the juvenile court entered an order terminating its jurisdiction over the child, we conclude that the juvenile court properly exercised its continuing jurisdiction over the child in ruling on the maternal aunt’s petition for custody of the child.[3]
On appeal, the father argues that the juvenile court exceeded its discretion when it awarded the maternal aunt custody of the child. In doing so, he argues that the findings of fact in the juvenile court’s judgment were unsupported by the evidence, that the maternal aunt failed to meet her burden of proving that he was unfit, and that the juvenile court erred by considering his physical appearance in making its custody determination. The father also argues that the juvenile court exceeded its discretion by failing to award him liberal visitation with the child.
The testimony presented at the June 2008 ore tenus hearing revealed the following. The mother and the father never married, but they were living together when the child was born in December 2004. D.G., the child’s paternal grandmother (“the paternal grandmother”), testified that the mother, the father, and the child moved into her home after the child was born. However, the father testified that he, the mother, and the child lived together until his relationship with the mother ended, approximately five weeks after the child was born, and that, at that time, the mother and the child moved in with his mother, the paternal grandmother. According to the father, the mother moved to Jasper shortly thereafter and left the child with his cousin. The paternal grandmother testified that the mother left the child with the father’s cousin around April or May of 2005.
*402 In May 2005, the father’s cousin filed a petition for custody of the child, referenced above, and the testimony of the parties confirmed that the father’s cousin was awarded pendente lite custody of the child. However, the paternal grandmother testified that the father’s cousin (her niece) had actually given her custody of the child during that time. The maternal aunt’s testimony indicated that the mother immediately tried to regain custody of the child and that the juvenile court returned custody of the child to the mother in August 2006. The maternal aunt testified that the paternal grandmother had allowed the mother to visit the child only on two occasions during the time that the paternal grandmother had custody of the child.
The father testified that he had assisted his cousin in obtaining custody of the child in May 2005 and that, at that time, he had agreed to terminate his parental rights to the child. However, he also stated that he had never signed anything to terminate his parental rights. Although it was confirmed that the father was a respondent listed on his cousin’s 2005 petition for custody of the child, the father stated that he was not involved in the custody action.
According to the father, he saw the child every day when his cousin had custody of the child and he tended to “100% or more” of the child’s needs during that time, including the child’s material needs, such as diapers, and the child’s physical needs, such as feeding and bathing the child. However, the father also testified that he had been working in Huntsville during that custody proceeding and that he was home only on the weekends. It was unclear where the father lived when he came back from Huntsville on the weekends. Further, according to the maternal aunt, the father was not involved with the child after May 2005 because his cousin had a restraining order entered against him.
The paternal grandmother testified that she had cared for the child during the first 20 months of the child’s life, even after the father’s cousin, her niece, was awarded custody of the child. The paternal grandmother admitted that she had attempted to intervene in the 2005 custody action in order to obtain custody of the child, and she admitted that she had tried to stop the return of the child to the mother in August 2006 by filing motions after the close of that custody trial.
After the mother obtained custody of the child in August 2006, she did not allow the father to visit the child. The father stated that the mother had a restraining order entered against him but that he would occasionally go to the mother’s place of employment to talk to her. The father stated that, before the mother disappeared, he had not seen the child in 16 months. The maternal aunt testified that the child did not recognize the father when he came to the maternal aunt’s home in November 2007, shortly after the mother disappeared, and that the child did not ask about the father.
At the time of the mother’s disappearance in November 2007, the father was living and working in Gulf Shores. When the father learned of the mother’s disappearance, he returned to Walker County and asked the maternal aunt for custody of the child. However, the maternal aunt expressed her desire to keep custody of the child until the mother was found, in light of the previous custody battle between the mother and the father’s family. The father agreed to allow the child to remain with the maternal aunt, and he apparently returned to Gulf Shores. The mother was discovered to be deceased on or about December 11, 2007.
At the time of her death, the mother had three children with three different fathers: El.D., who was four years old at the time *403 of the final hearing; the child, who was three years old at the time of the final hearing; and J.D., who was two years old at the time of final hearing. After the mother disappeared in November 2007, the maternal aunt took custody of the mother’s three children, with the permission of the fathers of the mother’s children. The maternal aunt stated that she was very close to the mother and that she had spent a significant amount of time with the child before the mother’s death.
The maternal aunt, who was 29 years old at the time of the hearing, testified that she lived in a three-bedroom, two-and-one-half-bathroom home. She had custody of her son, who was five years old at the time of the final hearing, as well as the mother’s three children. Her brother, who was 22 years old, lived in the basement of her home. The maternal aunt worked Sunday through Thursday from 10:30 p.m. until 8:30 a.m., and she hired a babysitter to care for the mother’s children and her child while she was at work. The maternal aunt’s child and the mother’s oldest child attended school, and the mother’s two younger children, including the child, remained at home with the maternal aunt on weekdays. The record indicated that the babysitter, friends of the maternal aunt, the maternal aunt’s brother, and the aunt and uncle of the maternal aunt helped the maternal aunt care for the children during the day while the maternal aunt slept.
The maternal aunt admitted that the father of her child, T.N., was imprisoned on drug charges at the time of the hearing. She stated that she was aware of a prior drug charge against T.N., and that T.N. had frequently come to her home before he was imprisoned so that he could visit their child. Before his incarceration, T.N. took their child and the mother’s oldest child to school before the maternal aunt returned from work. The maternal aunt also admitted that her brother had been arrested for possession of marijuana approximately one year before the hearing, but she testified that she had warned him that if he ever brought drugs into her home she would not allow him to live with her. She stated that she was trying to help her brother because he did not have anyone else to help him.
On cross-examination, the maternal aunt testified that her petition for custody of the child was based on her desire to keep the mother’s three children in the same household. She stated that she did not believe that the father was unfit, but she also stated that the child did not know the father because the father had not spent time with the child. The maternal aunt testified that the father had not provided any financial support for the child to the mother after their relationship ended and that the father had not provided any support for the child after she was awarded pendente lite custody of the child in December 2007.
The record indicated that the father had been living in Florida at some time and that he had moved to Gulf Shores approximately 18 months before the hearing.[4] According to the father, he had moved back into his mother’s home in Fayette County approximately two weeks before the hearing. He stated that his mother and stepfather were willing to help him care for the child if he was awarded custody of the child but that he was able to care for the child himself. The paternal grand *404 mother testified that the father stayed at her home only on weekends and that during the week he stayed with a coworker in another town so that he could ride with him to work. When questioned further about his living arrangements, the father stated that, if he were awarded custody of the child, he would live “full-time” with his mother and stepfather.
The father testified that his driver’s license was suspended, and he indicated that he relied on his mother and his coworkers for transportation. The father worked as a mason, and he stated that he had been employed “off and on” by the same company for 18 months. At the time of the hearing, he earned $10 an hour, but he stated the he could earn more income once he retrieved his trade tools from Gulf Shores. The father stated that he could obtain health insurance through his employer, although he did not have insurance at the time of the final hearing.
The father has another child living in Florida who was six years old at the time of the final hearing. The father did not pay child support for that child “through the courts,” but he stated that he sent the child money when it was needed. The father stated that he had not seen his other child in a few years and that it was difficult to visit her because she lived in central Florida. The father admitted that he had had two domestic-violence-related charges filed against him: one by the mother, although those charges were dropped, and one by the mother of his child who lived in Florida. The father testified that he had pleaded guilty to the domestic-violence-related charge in Florida, which he described as a “touch or strike battery,” although he later testified that he had pleaded nolo contendré to that charge. However, the father admitted that he was guilty of the offense and that he had shaken the victim and pushed her in order to get away from her.
When asked if he had ever used any illegal drugs, the father responded that he had used marijuana “earlier in [his] childhood ... or my teenage years.” The father stated that he was not sure of the last time he had used marijuana, but he admitted that he could not pass a drug screen at the time of the hearing because he had used marijuana in the 30 days before the hearing. According to the paternal grandmother, the father possessed all the skills necessary to care for the child. She admitted that she was aware of the father’s use of marijuana, but she opined that marijuana was “better than being around cocaine” and that the child was “not in danger with marijuana as she would be with cocaine.” When asked if she knew that the father used marijuana “pretty regularly,” the paternal grandmother responded that she “tr[ied] not to know that.” She further testified: “I know he smokes [marijuana]. I don’t know if it is just socially or what.”
The father’s attorney objected to a question presented to the father by the maternal aunt’s attorney regarding the number of tattoos the father had on his body. The juvenile court overruled the objection, and the father stated that he had approximately 70 tattoos. The maternal aunt’s counsel questioned the father regarding the meaning of several of his tattoos, including one on the father’s head that the father identified as the symbol for anarchy. The father stated that he had had a problem with authority when he was younger but that he no longer had that problem. The father testified that he once worked at a tattoo parlor and that he did not pay for any of his tattoos but that his tattoos were worth “a couple of grand.”
The child’s guardian ad litem stated on the record that she had reservations about *405 the maternal aunt and the father. The guardian ad litem questioned the father’s stability, but she did not believe that the maternal aunt was able to prove that the father was unfit to have custody of the child.
Based on this evidence, the juvenile court entered a judgment that set forth specific findings of fact. Some of those findings were as follows:
“5. That there exists a history of conflict between the families concerning the custody of the ... child....
“6. In case number JU-05-276.01 ... the father’s cousin, obtained custody of the minor child.
“7. That during the pendency of case number JU-05-276.01, the ... [fjather’s family refused to allow the ... [mjother, ... or her family visitation with the minor child.
“8. At the conclusion of the litigation in said case, the [juvenile cjourt stated that [the father’s cousin] failed to meet the burden of proof necessary to retain custody. During that trial it was discovered that the ... child was actually living with the paternal grandmother. This information was concealed from the [juvenile cjourt and was only revealed through cross-examination by [the mother j’s attorney.
“9. That upon learning that the [juvenile cjourt ruled in favor of the ... [mjother, the ... [fjather’s family filed several motions to prevent the return of the ... child to the ... [mjother.
“10. That during the testimony of the [father] in the instant case, it was discovered that the [father] was dishonest and not forthcoming with the truth.
“11. That the [father] misled the [juvenile cjourt in regards to his domicile. The [father] testified that he lived with his mother[, the paternal grandmother,] and that she could assist him in the rearing of [the child].
“12. That when questioned on cross-examination, the [father] admitted that he actually lived in Jasper with a friend and only went to his mother’s residence on the weekends.
“18. That the [father] further misled the [juvenile cjourt in his testimony regarding his employment. The [father] testified that he was gainfully employed with a long history with this employer.
“14. The [father] testified that he had returned to Alabama from the State of Florida ‘some time ago’ and had been working during that time.
“15. That when questioned further on cross-examination, the [father] admitted that he had only been back in Alabama for a period of two weeks and that he had only recently began working. The [father] also admitted that his tools of his trade remained in Florida.
“16. Therefore, the [father] has no permanent residence and an unreliable work history and questionable present employment.
[[Image here]]
“19. That when questioned the [father] testified that he had used mari[j]uana in the past, but not for some time. This statement was, as was a large portion of his testimony, untrue. Upon further questioning and the possibility of a drug test, the [father] testified that he could not pass a drug test and that he would test positive for marihuana.
“20. That upon further questioning concerning illegal drug use, the [father] testified that he smoked mari|j]uana daily-
'll. The [father] has failed to establish even the most basic relationship with [the child]. The [father] testified that he has failed to provide any mone *406 tary support for his daughter during her life.
“22. The [father] has failed to maintain any type of relationship with [the child]. There has been no contact between him and the ... child. The [father] testified that he has lived in the State of Florida for a period of years with another woman and her children. The [father] was convicted of a ‘Touch or Strike’ offense in Florida and was required to complete anger management classes as a result of said conviction. The [father] was charged with a similar charge in Alabama whereby he was charged with Domestic Violence. The victim was ... the ... mother but she dropped the charges.
[[Image here]]
“25. The [father] is not interested in the custody of this child. The [father] wishes to avoid any obligation of child support and is only participating in this case for the paternal grandmother. The [father’s extended family is playing a large role in the pursuit of custody.”
Based on its findings of fact, the juvenile court held that the father was “unfit and that he had voluntarily forfeited his place as the fit and proper person to have custody” of the child based on
“[ (1) ] his lack of establishing any hint of a relationship with the ... child[; (2) ] his refusal to financially support [the] ... child[; (3) ] ... his misconduct stemming from his being charged and convicted of domestic violence[; (4) his] prolific illegal drug use[;] and [ (5) ] his placing his own interests and desires above that of [the child].”
On appeal, the father argues that some of the juvenile court’s specific findings of fact were unsupported by evidence in the record and that the juvenile court erred by relying on those erroneous findings to support its judgment finding him unfit.[5] In reviewing the propriety of a judgment that awards custody of a child to a nonparent over a natural parent, we must consider that
“Alabama law requires that a nonparent may overcome a natural parent’s prima facie right to custody of his or her child only by adducing clear and convincing evidence that the parent has either voluntarily forfeited the right to custody or has neglected the child to a degree that renders the parent unfit to be entrusted with the child’s care.”
J.W. v. D.W., 835 So.2d 206, 210 (Ala.Civ. App.2002) (citing Ex parte Terry, 494 So.2d 628, 632 (Ala.1986)).
Our standard of review is well settled:
“ ‘ “[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.” Philpot v. State, 843 So.2d 122, 125 (Ala.2002). “ ‘The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.’ ” Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)).
“Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005). ‘Under the ore tenus standard, the judgment of the trial court *407 may not be disturbed unless its findings are “ ‘clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.’ ” ’ Fowler v. Johnson, 961 So.2d 122, 129 (Ala.2006) (quoting Pollard v. Unus Props., LLC, 902 So.2d 18, 23 (Ala.2004), quoting in turn American Petroleum, Equip. & Constr., Inc. v. Fancher, 708 So.2d 129, 132 (Ala.1997)).”
Water Works & Sanitary Sewer Bd. of City of Montgomery v. Parks, 977 So.2d 440, 443-44 (Ala.2007). Furthermore, “[i]t is the province of the trial courts to estimate the credibility of witnesses, and if a trial court concludes that a witness was willfully untruthful, that court may disregard any or all of that witness’s testimony.” Summers v. Summers, 58 So.3d 184, 188 (Ala.Civ.App.2010).
Considering the specific findings of fact in the judgment, it appears that the juvenile court believed that the father was willfully untruthful about at least one issue—his usage of marijuana. Accordingly, the juvenile court was justified in disregarding any part or all of the father’s testimony. With that premise in mind, we will determine whether the juvenile court’s findings of fact, and its judgment declaring the father to be unfit, are so unsupported by the evidence that reversal of the judgment is required.
First, we will address the juvenile court’s finding that the father failed to “establish!] any hint of a relationship” with the child. The father argues that he presented evidence indicating that he saw the child every day for the first 20 months of the. child’s life, that he cared for the child while she was in the custody of his cousin, and that the mother refused to allow the father to see the child after she gained custody of the child in August 2006. We agree that the evidence indicated that the father had established a relationship with the child after her birth in December 2004, but the evidence regarding the father’s role in caring for the child after his cousin was awarded custody was disputed. Although the father stated that he saw the child every day, he also testified that he was working out of town during that time, and the maternal aunt testified that the father’s cousin had a restraining order entered against him. Regardless, there was clear and convincing evidence indicating that the father had not maintained whatever relationship he had established with the child. Between August 2006 and December 2007, the father had not seen or otherwise contacted the child. The evidence indicated that the mother had not allowed the father to visit the child after August 2006, but the father had not taken any legal action that would have enabled him to maintain a relationship with the child. Although the juvenile court’s finding of fact would have been more accurate if it had stated that the father had failed to “maintain” a relationship with the child (as the juvenile court stated in paragraph 22 of the judgment), we conclude that the juvenile court’s finding that the father failed to establish a relationship with the child is substantially in conformance with the evidence presented at the ore tenus hearing.
Next, the father argues that the evidence did not support the juvenile court’s conclusion that he refused to financially support the child. The father again points to evidence indicating that he tended to all the child’s needs while his cousin had custody of the child. Even if the juvenile court believed the father’s testimony in this regard, it was undisputed that the father had not provided any support for the child to the mother after August 2006 and that he had not provided any support for the child to the maternal aunt after she gained pendente lite custody *408 of the child. There was no indication that the father was financially unable to support the child. Accordingly, we conclude that there was clear and convincing evidence to support the juvenile court’s conclusion that the father had failed to financially support the child.
The father next argues that there was insufficient evidence to support a finding that he was charged and convicted of domestic violence. We agree with the father that there was no evidence to support the juvenile court’s finding in paragraph 22 of the judgment that the father was required to attend anger-management classes as a result of his “touch or strike” conviction in Florida. The father argues that because he pleaded nolo contendré to the touch or strike charge in Florida, we cannot consider that conviction to prove the fact that he committed the offense underlying the conviction, citing McNair v. State, 653 So.2d 320, 327 (Ala.Crim.App.1992). Although that premise may be true, it does not require us to conclude that the juvenile court erroneously determined that the father had been charged and convicted of domestic violence. First, it was undisputed that the father had been charged with a touch or strike battery involving the mother of his older child. The father initially testified that he had pleaded guilty to the touch or strike charge in Florida and that he was guilty of the touch or strike charge filed against him by the mother of his other child because he had pushed the victim. Therefore, based on the father’s testimony, the juvenile court could have concluded that the father had been charged and convicted of a domestic-violence offense.
Finally, the father argues that the evidence did not support the juvenile court’s finding that he was a prolific drug user. The father argues that there was no evidence presented to support the juvenile court’s conclusion in paragraph 20 of the judgment that the father smoked marijuana daily. Although the juvenile court, in order to decide the issue of custody, was “‘in the better position to evaluate the credibility of the witnesses ... and ... to consider all of the evidence, as well as the many inferences that may be drawn from that evidence,’ ” Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997) (quoting Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994)), inferences drawn from the evidence must be reasonable. We agree with the father that the evidence presented does not support a finding that the father smoked marijuana daily or that he was a “prolific” drug user. However, there was clear and convincing evidence indicating that the father had smoked marijuana within 30 days of the hearing, and the juvenile court could have drawn a reasonable inference from the paternal grandmother’s testimony that the father used marijuana.
The specific findings of fact in the judgment indicate that the juvenile court believed that the father had been willfully untruthful regarding his domicile, but the father argues on appeal that he answered the questions presented to him about where he lived truthfully. The father testified that he lived with the paternal grandmother and her husband, but it was later revealed that the father “lived” at the paternal grandmother’s home only on the weekends. Even if the father considered the paternal grandmother’s home to be his “home,” we agree that it was misleading for the father to testify that he lived with the paternal grandmother at the time of the hearing when, in actuality, he spent only two of seven days of the week at the paternal grandmother’s home.
There was also some confusion about how long the father had been living and working in the Walker County area. When the father testified that he had been *409 back in Alabama for 18 months, and that he had been working for the same employer “off and on” for 18 months, the juvenile court understood the father to testify that he had been living and working in the Walker County area for approximately 18 months before the hearing. However, it later became clear that the father moved to Gulf Shores when he moved back to Alabama and that he had been living and working in the Walker County area for only two weeks before the hearing. The father’s testimony on this subject was confusing, if not misleading.
The father also takes issue with the findings of fact found in paragraphs six through nine of the judgment, which discussed the prior custody proceeding filed by the father’s cousin. Most of the information regarding that proceeding was taken from the paternal grandmother’s testimony. However, to the extent that any part of the findings of fact in those paragraphs is unsupported by the evidence presented at the ore tenus hearing, the error was harmless because it had no bearing on the father’s fitness to care for the child at the time of the hearing.
We have thoroughly reviewed the record on appeal and the specific findings of fact made by the juvenile court in its judgment, and we cannot conclude that the judgment, as a whole, is so unsupported by the evidence that it must be reversed. Despite the existence of some errors in the findings of fact, our review of the record reveals that there was clear and convincing evidence to support the juvenile court’s conclusion that the father was unfit to be entrusted with the care and upbringing of the child at the time of the hearing. The record indicated that, at the time the maternal aunt petitioned for custody of the child, the father had not seen the child in at least 16 months and that the father had not maintained a relationship with the child during his absence from her life. See Ex parte A.M.B., 4 So.3d 472, 478 (Ala.2008) (noting the mother’s failure to visit the child as a factor to support a determination of her unfitness). Furthermore, at the time of the final hearing, the evidence indicated that the father had not provided financial support for the child in almost two years, that the father could not pass a drug screen, and that the father would have to rely on the paternal grandmother in order to properly care for the child. Indeed, the record also indicated that the father had never been solely responsible for the care of the child. See Ex parte G.C., 924 So.2d 651, 660 (Ala.2005) (in determining whether a parent is fit for custody of a child, a court must consider “whether the parent is fit to have the care, custody, and control of, that is, the total responsibility for, the child”); but see Ex parte 4 So.Bd at 478 (stating that, “in the abstract, a parent’s reliance on others, particularly family, for support is not, in and of itself, determinative of the parent’s unfitness”).
In A.M.B. v. R.B.B., 4 So.3d 468, 471 (Ala.Civ.App.2007), this court, affirming a judgment that found a mother to be unfit, stated:
“Unfitness that warrants a custody award to a nonparent is not defined solely as active neglect or abuse. Rather, a determination of unfitness is generally based upon the totality of the evidence and is often evidenced by an unwillingness on the part of a parent to put the child’s best interests ahead of the parent’s own desires.”
As noted above, the juvenile court found that the father had placed his own interests and desires above the child’s, and the father did not challenge that finding. Considering the totality of the evidence in the record, we find clear and convincing evidence to support the juvenile court’s *410 judgment finding the father unfit to be entrusted with the care of the child. Accordingly, we affirm that aspect of the judgment.
Next, the father argues that the juvenile court’s consideration of his physical appearance merits reversal of the custody determination in favor of the maternal aunt. The father cites the juvenile court’s interest in the number of and the meaning of his tattoos during the hearing and a portion of the judgment, wherein the juvenile court stated:
“[T]he [juvenile cjourt only has the opportunity to have a glimpse into one’s person during a trial and must make a judgment regarding that person’s fitness for custody. The [juvenile c]ourt feels that you have to look at the person as a whole in making this determination. The [juvenile c]ourt takes into consideration a party’s physical appearance as one piece of this puzzle.”
The judgment further stated that the appearance of the father spoke “volumes” to the juvenile court, and the judgment described the physical appearance of the father on the day of the hearing, including his clothing, his tattoos, and his body piercing. In support of his argument that the juvenile court’s consideration of his physical appearance merits reversal of the custody determination, the father cites Jennings v. Jennings, 490 So.2d 10, 13 (Ala.Civ.App.1986), wherein this court acknowledged that “private biases and social pressures are impermissible consideration for removal of a child from the custody of a parent.” In Jennings, this court affirmed an award of custody of a child to a husband pursuant to a divorce proceeding. Id. In that case, the trial court had been aware that the wife had begun dating a man of a different race, but, in awarding custody of the child to the husband, the trial court had stated that “ ‘[n]either racial prejudices nor social considerations have been proved nor has any such consideration had any bearing on this decree.’ ” Id. (quoting trial court’s judgment).
During the hearing, when the maternal aunt’s counsel asked the father about his tattoos, the juvenile-court judge stated, in response the father’s counsel’s objection:
“Well, you know, the Court only gets a limited snapshot of people in their lives. I’ve noticed also that [the father] has numerous tattoos, and if [the maternal aunt’s counsel] hadn’t asked him how many he had, I was going to. And I was also going to ask him what some of them meant because, quite frankly, what we advertise on our bodies are something that we generally care very strongly about. So, I think it’s kind of an eye in to their personalities so I’d like to find out a little bit about him.”
We agree that, generally speaking, a party’s physical appearance, including the type of clothing the party is wearing and the existence of tattoos and body piercing, is irrelevant to the determination of custody of a child. However, we cannot disagree that messages displayed by a party on his or her person may reveal pertinent evidence about the character of a party seeking custody. See Ex parte Devine, 398 So.2d 686, 696 (Ala.1981) (listing the character of the party seeking custody as a pertinent factor in determining what custodial arrangement would serve the best interests of the child).
After a careful review of the entire record on appeal, we do not believe that the juvenile court’s consideration of the father’s physical appearance as “one piece of the puzzle” to determine the father’s fitness mandates a reversal of the juvenile court’s custody determination. It is clear from the record that the juvenile court did not base its determination of the father’s *411 fitness solely on his physical appearance, and, as discussed above, the record contains clear and convincing evidence of the father’s unfitness without consideration of his physical appearance. Thus, to the extent that it was error to consider the father’s physical appearance, the error was harmless because there was other evidence to support the juvenile court’s conclusion that the father was unfit to have custody of the child at the time of the hearing.
The father has not argued on appeal that the award of custody to the maternal aunt does not serve the best interests of the child. See T.T.T. v. R.H., 999 So.2d 544, 557 (AJa.Civ.App.2008) (noting that, after a nonparent has overcome a natural parent’s prima facie right to custody of his or her child, the juvenile court must make a custody determination based on the best interests of the child). Accordingly, the juvenile court’s judgment awarding the maternal aunt custody of the child is due to be affirmed.
Finally, the father argues that the juvenile court exceeded its discretion by failing to award him “liberal” visitation with the child.
“ ‘The determination of proper visitation ... is within the sound discretion of the trial court, and that court’s determination should not be reversed absent a showing of an abuse of discretion.’ Ex parte Bland, 796 So.2d 340 (Ala.2000). ‘[C]ases in Alabama have consistently held that the primary consideration in setting visitation rights is the best interests and welfare of the child. Furthermore, each child visitation case must be decided on its own facts and circumstances.’ Fanning v. Fanning, 504 So.2d 737, 739 (Ala.Civ.App.1987) (citations omitted). ‘When the issue of visitation is determined after oral proceedings, the trial court’s determination of the issue will not be disturbed absent an abuse of discretion or a showing that it is plainly in error. Andrews v. Andrews, 520 So.2d 512 (Ala.Civ.App.1987).’ Dominick v. Dominick, 622 So.2d 402, 403 (Ala.Civ.App.1993).”
K.L.U. v. M.C., 809 So.2d 837, 840-41 (Ala.Civ.App.2001).
The father argues that the juvenile court’s failure to award him liberal visitation with the child effectively terminated his parental rights to the child. We disagree. This court, in K.C. v. Jefferson County Department of Human Resources, 54 So.3d 407, 413 (Ala.Civ.App.2010), rejected an argument made by a natural parent that “a judgment placing a child ■with a relative custodian and providing for visitation with a natural parent is equivalent to a judgment terminating that parent’s parental rights.” As we noted in K.C., the natural parent, in this case the father, retains “residual rights and responsibilities in and to the child, including the right to continued visitation and the responsibility of support....” 54 So.3d at 413 (citing § 12-15-102(23), Ala.Code 1975, a provision in the new Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975; but see former Ala.Code 1975, § 12-15-1(24), which was substantially similar to § 12-15-102(23)).
To support his argument that the juvenile court exceeded its discretion by awarding him visitation with the child only every other weekend of each month, the father points to evidence indicating that the maternal aunt agreed that the child should have a relationship with the father. However, it appears that the juvenile court considered that evidence, and, despite the fact that the father did not have a relationship with the child at the time of the hearing, the juvenile court allowed the father visitation with the child every other weekend. There is no indication that the father will not be able to develop a mean *412 ingful relationship with the child pursuant to his visitation award. Moreover, the father is free to petition the appropriate court for a modification of his visitation rights in the future. Based on the argument presented by the father, we cannot conclude that the juvenile court exceeded its discretion by awarding the father visitation with the child only every other weekend of each month and at all other times to which the parties agree.
Accordingly, we conclude that the judgment of the juvenile court is due to be affirmed.
AFFIRMED.
PITTMAN and THOMAS, JJ., concur.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.

. That judgment does not appear in the record on appeal. This procedural history was gleaned from testimony presented at the ore tenus hearing in the underlying proceeding.

. Former § 12-15-32 was repealed on January 1, 2009, the date the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975, became effective. See Act No. 2008-277(a), Ala. Acts 2008.

.Because of the adoption of the new Alabama Juvenile Justice Act, there is no prece-dential value to this jurisdictional analysis for proceedings initiated on or after January 1, 2009. See, e.g., Ex parte T.C., 63 So.3d 627 (Ala.Civ.App.2010).

. When he was asked how long he had been back in Alabama, the father responded, "not even a year-and-a-half,” and he later agreed with counsel's statement that he had been back in Alabama for 18 months. The father was apparently referring to his move from Florida to Gulf Shores, not a move from Florida to the area near Walker County.

. The father argues that parts of the juvenile court’s specific findings of fact in paragraphs 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 19, 20, 21, and 22 are unsupported by evidence in the record. The father has not challenged the juvenile court's finding that the evidence demonstrated that the father placed his own interests and desires above the child’s.