THOMAS, Judge.
 

 In October 2008, the Jefferson County Department of Human Resources (“DHR”) filed dependency petitions regarding J.C., I.C., S.P., and Z.P., the children of K.C. (“the mother”).
 
 [1]
 
 The children had been removed from the mother’s home after the mother’s paramour, Sa.R. (“the paramour”), with whom the mother and the children lived, was involved in a physical altercation with J.C. J.C. reported that the paramour had attempted to “whip” him and that, when J.C. fought the paramour off, the paramour placed his hands around J.C.’s throat. The other children reported that the paramour had disciplined them with a belt at times and that the mother had not intervened on their behalf. The mother admitted that the children were dependent, and a judgment to that effect was entered on October 23, 2008. At that time, J.C. and I.C. were placed in the physical custody of A.O. (“the paternal grandmother”) and S.P. and Z.P. were placed in the custody of S.S. (“the maternal aunt”) and her husband, F.S.
 

 After intermediate dispositional reviews in February and July 2009, the juvenile court held a final dispositional hearing on December 29, 2009. After that hearing, the juvenile court entered a judgment placing permanent physical custody of the children with their respective relative custodians. The judgment further closed the case to judicial review. The mother filed a postjudgment motion, which was denied. She then timely appealed the juvenile court’s judgment to this court.
 

 The evidence at trial indicated that the children did not desire to return to the mother’s custody so long as she remained with the paramour. All four children testified that they did not want to be around the paramour. S.P. testified that she was “tired of it” and complained that the mother was not willing to change and that the mother chose the paramour over her own children.
 

 The family’s DHR caseworker, Pauline Truss, noted that the children had conveyed to her that they were tired of the abuse in the home. Truss reported that the mother had complied with DHR’s requests to undergo psychological testing and use family-support services. Truss further testified that there was nothing the paramour could do to rehabilitate himself. However, she noted that DHR had returned Si.R., the biological child of the mother and the paramour, to the home because the paramour was not considered a safety concern to that child, who Truss said the children had reported was seen as a “golden child.” Thus, it appears that the paramour’s status as a cruel and abusive stepfather figure is at the root of the discord in the family.
 

 The mother testified that she would be the disciplinarian if the children were returned to her custody. However, the evidence overwhelmingly demonstrated that the mother had left most disciplinary mat
 
 *410
 
 ters to be handled by the paramour before the children were removed from her custody. The mother’s testimony attempted to minimize the altercation between J.C. and the paramour; she insisted that she had stepped in to separate the two during the altercation and that she would protect her children from the paramour if necessary. Despite her insistence that the children would be protected, the mother testified that she and the paramour had J.C. leave the home after the altercation instead of requiring the paramour to leave.
 

 Other troubling testimony included testimony from both I.C. and the maternal aunt regarding an altercation the mother had with the maternal aunt when the maternal aunt brought I.C. to the maternal grandmother’s house for the mother to do I.C.’s hair. According to the maternal aunt, she and the mother have had a rocky relationship for some time. The maternal aunt explained that the mother would not telephone the maternal aunt and that she would not answer telephone calls from the maternal aunt, despite the fact that two of her children were in the maternal aunt’s custody. Instead, the maternal aunt explained, the mother would have another family member telephone to convey messages to the maternal aunt. On the date of the altercation, the maternal aunt received a message from J.C. that the mother wanted the maternal aunt to take I.C. to the maternal grandmother’s home instead of the paternal grandmother’s home, as originally planned. Because the plans had changed abruptly, the maternal aunt did not arrive at the maternal grandmother’s home at the expected time. According to both the maternal aunt and I.C., the mother was angry when the maternal aunt arrived and the mother began shouting. Later, once inside the maternal grandmother’s home, the mother began to rant at the maternal aunt and approached the chair in which the maternal aunt was sitting in an aggressive and threatening manner. The maternal aunt said that she stood and told the mother to back away. At that point, both the maternal aunt and I.C. said, I.C. began to cry and yell at her mother that the mother should just do I.C.’s hair as planned and quit making a commotion. The mother and the maternal aunt began a physical altercation, which was concluded when the maternal grandfather forcibly separated the mother and the maternal aunt and made the mother leave the premises.
 

 The record also contains evidence that is favorable to the mother. The testimony indicated that the mother was a good parent to Si.R., who was returned to her custody after DHR determined that the paramour, who is Si.R.’s biological father, was not a threat to his safety. Gloria Halsey, who provided family-support services to the mother for approximately one year, testified that the mother had the skills to properly parent her children. Halsey noted that the mother’s interaction with Si.R. was appropriate, for the most part, but Halsey admitted she had not seen the mother interact with the other children. Halsey admitted that, if the children were returned to the mother’s care, “they” would need parent coaching.
 

 The paramour testified that he had completed anger-management classes at the behest of DHR. He said that he had learned from those classes. Notably, he said that he had learned that he should not simply react to the children if they were disobedient and that he should take the time to listen to the children and to look at things from their perspective. He testified that he would allow the mother to be the primary disciplinarian to the children if they were returned to her custody.
 

 A report from the children’s counselor, Chad Harris, was admitted into evidence.
 
 *411
 
 Harris’s report indicated that the children had reported favoritism toward Si.R. in the home, had reported being physically abused, had witnessed domestic violence in the home, and had “expressed intense bitterness, hurt and grief regarding their mother having chosen [the paramour] over them.” He also noted in his report that the children were “terrified of being exposed to [the paramour] and potential abuse in his home”; the report indicated that the children had all expressed that they never wanted to return to the home the mother shared with the paramour. In addition, the report explained that the children “possess varying degrees of ambivalence, distrust and disrespect for their mother, who they view as having chosen an abuser over them.” In his report, Harris recommends that “the matter of reunification be clarified and finalized [so that it could be conveyed to the children] that [reunification] is not a possibility and that the children should no longer fear being forced to return to [the paramour’s] home.” Like Harris’s report, the psychological reports for all the children recommend continuation in their relative placements based upon the children’s stated desire not to return to the paramour’s home.
 

 On appeal, the mother argues that the juvenile court’s judgment should be reversed because, she says, the evidence does not support the juvenile court’s decision to award permanent custody of the children to their respective relative custodians. She argues that DHR did not make reasonable efforts to reunify the family, thus preventing the juvenile court from making a permanent disposition of custody. She also urges this court to equate the permanent disposition of the children with a termination of her parental rights. Finally, she argues that the juvenile court’s refusal to allow her to discharge her appointed counsel on the day of trial forced her to participate in the trial without the effective assistance of counsel; thus, she contends, the juvenile court’s judgment must be reversed because it was entered in violation of her right to effective assistance of counsel.
 

 We will first address the mother’s contention that the juvenile court’s refusal to allow the mother to discharge her appointed counsel on the day of trial deprived the mother of the effective assistance of counsel. Counsel for the mother presented a motion to withdraw to the juvenile court on the day of trial. In his motion, counsel stated that the mother had communicated that she “lacked confidence” in counsel’s legal strategy and that the mother had clearly indicated that she no longer desired counsel’s services. Based on the argument presented to the juvenile court on the day of trial, the mother had contacted her appointed counsel on December 23, 2009, leaving a message indicating that she did not feel that he had been effective in his representation of her; counsel contacted the mother about her message on December 24, 2009. The mother specifically complained at trial that counsel had not made motions regarding certain disputes over visitation and over the mother’s desire for more counseling from DHR. The juvenile court noted that the case had been specially set since December 7, 2009, and that the mother’s motion would require a continuance, which the juvenile court was not inclined to grant. The juvenile court gave the mother the option of proceeding pro se, proceeding pro se with the assistance of counsel, or proceeding with counsel; the mother opted to allow counsel to continue to represent her.
 

 We have explained the heavy burden placed on a party claiming ineffective assistance of counsel.
 
 E.S.R. v. Madi
 
 
 *412
 

 son County Dep’t of Human Res.,
 
 11 So.3d 227, 238-39 (Ala.Civ.App.2008).
 

 “[T]o prevail on a claim of ineffective assistance of counsel, a party must show (1) that his or her counsel’s performance was deficient and (2) that he or she was prejudiced as a result of the deficient performance.
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).”
 

 Id.
 
 at 238. The party seeking to establish the ineffectiveness of his or her counsel “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.”
 
 Strickland v. Washington,
 
 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The
 
 Strickland
 
 Court explained that “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome” of the proceeding.
 
 Strickland,
 
 466 U.S. at 694. Merely showing that the errors complained of “had some conceivable effect on the outcome of the proceeding” is not sufficient.
 
 Id.
 
 at 693. “Judicial scrutiny of counsel’s performance must be highly deferential,” so a trial court must begin its review of an ineffective-assistance-of-counsel claim by “indulging] a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 
 Id.
 
 at 689. Notably, “[a] mere difference of opinion between the appellant and [his or] her trial counsel as to trial strategy is insufficient to render counsel’s performance ineffective under the
 
 Strickland
 
 test.”
 
 Moore v. State,
 
 659 So.2d 205, 209 (Ala.Crim.App.1994) (citing
 
 Stone v. State,
 
 579 So.2d 702 (Ala.Crim.App.1991)).
 

 On appeal, the mother argues that counsel should have filed more motions on her behalf and that he should have filed his motion to withdraw sooner than the date of trial. She does not make any argument that the outcome of her case would have been any different if counsel had filed additional motions or if he had filed his motion to withdraw sooner.
 
 [2]
 
 In addition, she makes no argument concerning her counsel’s effectiveness at trial. Thus, the mother has not presented a convincing argument that the juvenile court’s judgment is due to be reversed on the basis that her counsel was ineffective
 
 before trial.
 

 The mother’s other arguments concern the propriety of the juvenile court’s decision to grant permanent custody of the children to their respective relative custodians. She argues that the evidence does not support the conclusion that custody of the children should have been placed with the custodians. Although she concedes that the juvenile court had wide discretion under the best-interest standard to determine the children’s placement upon the finding of dependency,
 
 see
 
 Ala.Code 1975, § 12-15-314(a), and
 
 W.T.H. v. M.M.M.,
 
 915 So.2d 64, 70 (Ala.Civ.App.2005) (explaining, under former Ala.Code 1975, § 12-15-71, the predecessor statute to § 12-15-314(a), that the best-interest standard governs the dispositional phase of a dependency proceeding), she also argues that the juvenile court’s permanent placement of the children with relatives is tantamount to a termination of her parental
 
 *413
 
 rights. Finally, she argues that DHR failed to make reasonable efforts to reunite the family.
 

 Our review of the juvenile court’s award of custody to the respective relative custodians is limited. Our supreme court has explained the standard of review of a custody award in a dependency case:
 

 “Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court’s findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error.
 
 Reuter v. Neese,
 
 586 So.2d 232 (Ala.Civ.App.1991);
 
 J.S. v. D.S.,
 
 586 So.2d 944 (Ala.Civ.App.1991). This presumption is especially applicable where the evidence is conflicting.
 
 Ex Parte P.G.B.,
 
 600 So.2d 259, 261 (Ala.1992). An appellate court will not reverse the trial court’s judgment based on the trial court’s findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See
 
 Ex Parte Walters,
 
 580 So.2d 1352 (Ala.1991).”
 

 Ex parte Alabama Dep’t of Human Res.,
 
 682 So.2d 459, 460 (Ala.1996). Furthermore, when a juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence.
 
 D.M. v. Walker County Dep’t of Human Res.,
 
 919 So.2d 1197, 1210 (Ala.Civ.App.2005).
 

 We will first dispense with the mother’s argument that we should consider the permanent placement of the children with relatives to be tantamount to a termination of parental rights and apply the two-prong test applied to termination-of-parental-rights cases, which requires a finding of dependency and a showing that no viable alternatives to termination of parental rights exist.
 
 See Ex parte Beasley,
 
 564 So.2d 950, 954 (Ala.1990). We cannot agree that a judgment placing a child with a relative custodian and providing for visitation with a natural parent is equivalent to a judgment terminating that parent’s parental rights. The parent whose child has been placed in the permanent care of another has residual rights and responsibilities in and to the child, including the right to continued visitation and the responsibility of support,
 
 see
 
 Ala. Code 1975, § 12-15-102(23), and may later petition the court for a modification of the custody award. None of those rights inure to a parent whose rights have been terminated; a “termination of parental rights” is defined as “[a] severance of all rights of a parent to a child.” Ala.Code 1975, § 12-15-301(10). Therefore, we will not accept the mother’s invitation to evaluate the juvenile court’s judgment in the present case under the standard set out in
 
 Ex parte Beasley.
 

 The mother next argues that the evidence at trial indicates that DHR failed to use reasonable efforts aimed at reuniting the family. She specifically notes that DHR never required her, the children, and the paramour to undergo any type of family counseling to address the issues raised by the paramour’s discipline methods. However, “[w]hether efforts at reunification have been reasonable and whether those efforts have failed or succeeded are questions of fact for the juvenile court to determine.”
 
 R.T.B. v. Calhoun County Dep’t of Human Res.,
 
 19 So.3d 198, 204 (Ala.Civ.App.2009). Although we do not disagree that family counseling may have been one potential service DHR could have offered to this family, the recommendations of the professional counselors involved in the family’s case indicated that
 
 *414
 
 the children had very strong negative feelings toward the paramour and the mother and that any plan to reunite the children with the mother so long as she and the paramour resided in the same home was unwise and unlikely to be successful. DHR could well have determined that family counseling would be fruitless. Although we agree with the mother that, generally, DHR is to provide services that are aimed at reuniting the family, DHR is not required to offer services that appear unadvisable under the circumstances of the individual case or that would not lead to the reunification of the family.
 
 See
 
 Ala. Code 1975, § 12-15-301(6) (defining “reasonable efforts” as, among other things, those efforts made to “make it possible for a child to return safely to his or her home” but providing that, “[i]n determining the reasonable efforts to be made with respect to a child, and in making those efforts, the health and safety of the child shall be the paramount concern”);
 
 see also J.J. v. Lee County Dep’t of Human Res.,
 
 979 So.2d 823, 832 (Ala.Civ.App.2007) (plurality opinion) (“[A]ny effort at rehabilitation would only be reasonable if such effort, if successful,
 
 could remove the obstacle
 
 to family reunification.” (emphasis added)); and
 
 J.B. v. Jefferson County Dep’t of Human Res.,
 
 869 So.2d 475, 482 (Ala.Civ.App.2003) (plurality opinion) (noting that what constitutes “reasonable efforts” is a “fact-dependent inquiry” and that “the efforts actually required by DHR in each case ... depend on the particular facts of that case ... and the best interests of the child”). In addition, we note that DHR had urged the mother to separate from the paramour to facilitate the children’s return to her custody; although the mother testified at trial that she would do so if her failure to do so meant that her children would not return home, the mother had made no effort to leave her paramour and, indeed, appeared to justify his behavior toward her children. Thus, DHR and the juvenile court could have concluded that the mother was unwilling to satisfy the principal goal of separating from the children’s abuser, thus leading to the failure of DHR’s plans to reunify the family.
 
 See J.P. v. S.S.,
 
 989 So.2d 591, 601 (Ala.Civ.App.2008) (holding that a father’s failure to satisfy the goal set out for him by DHR could support a conclusion that DHR had made reasonable efforts to reunify him with his children but that they had failed). DHR concluded, and the juvenile court apparently agreed, that the mother would not protect the children from the paramour, thus making the reunification of the family impossible while the mother continued to reside in the same home as the paramour.
 
 See, e.g., B.M. v. State,
 
 895 So.2d 319, 334 (Ala.Civ.App.2004) (affirming the termination of a father’s parental rights based on evidence indicating that the father’s refusal to believe that the mother had abused the child would prevent the father from protecting the child from abuse at the hands of the mother).
 

 The juvenile court had before it sufficient evidence to determine that the best interests of the children would be served by continuing placement with their respective relative custodians. The children had all expressed a desire to remain in their placements and a desire not to be placed in the home with the paramour. The mother’s reluctance to separate from the paramour, coupled with the fact that the paramour and the mother have a child together, militated in favor of the juvenile court’s decision to make the custodial arrangement a permanent one. Indeed, DHR is to present and a juvenile court is to consider a permanency plan for a child removed from his or her home within 12 months after removal and no less frequently than every 12 months thereafter. Ala.Code 1975, § 12-15-315. One of the
 
 *415
 
 potential permanency plans mentioned specifically in the statute is permanent placement with a relative. § 12-15-315(3). Permanent placement with the children’s respective relative custodians will provide the children permanency and stability, while allowing the mother and the children to continue to visit and to repair their relationships with each other. However, no further action by the State to reunite the family would be warranted under the situation presented here.
 
 See M.W. v. Houston County Dep’t of Human Res.,
 
 773 So.2d 484, 487 (Ala.Civ.App.2000) (noting, in a termination-of-parental-rights case, that there comes a point when “the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent”). Thus, we affirm the judgment of the juvenile court placing permanent custody of the children with their respective relative custodians.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.
 

 [1]
 

 . At that time, DHR also filed a dependency petition regarding Si.R., another of the mother’s children. However, Si.R. was returned to the mother’s custody, and the judgment on the dependency petition as to him is not at issue in this appeal.
 

 [2]
 

 .
 
 We note, however, that the only other date counsel could have filed the motion to withdraw was December 28, 2009, the day before trial. The courthouse was closed on December 24, 2009, because the Chief Justice had granted administrative leave to all Administrative Office of Court employees for that date, December 25 was a State holiday, December 26 was a Saturday, and December 27 was on Sunday. It appears to this court unlikely that one day would have impacted the juvenile court’s decision to deny the motion to withdraw and grant a continuance.