Rel: September 6, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

_____

### CL-2024-0074

_____

**Kendrum Demell Robinson**

**v.**

**Katina Lynette Robinson**

**Appeal from Shelby Circuit Court**
**(DR-22-900471)**

LEWIS, Judge.

Kendrum Demell Robinson ("the father") appeals from a judgment entered by the Shelby Circuit Court ("the trial court") that, among other things, divorced him from Katina Lynette Robinson ("the mother"); awarded custody of K.J., the parties' son ("the son"), to the father and

custody of K.D.R., the parties' daughter ("the daughter"), to the mother; and established visitation for both parents. We affirm the judgment of the trial court.

Evidence and Procedural History

The parties married on June 11, 2011. There were two children born of the marriage, the son and the daughter, who were 13 years old and 7 years old, respectively, at the time of the trial discussed infra, which was held on July 26, 2023. According to the mother, during the marriage, she "did everything" with respect to the parties' children; she "enrolled them in school," "went to PTO meetings," and "went to practices." The mother testified that, because the father typically worked a night-shift job, she was the "involved parent." The mother further testified that she was the disciplinarian while the father was the children's friend; she also testified that the father had used profanity around the son.

According to the father, before he separated from the mother, he attended the children's sporting events and dances. The father testified that, during his days off from work in the summer of 2022, he would play with the children, "attend to them," do "TikTok dances," "[p]lay games"

with the son, "go outside," and generally "[d]o a lot of stuff" while the mother was at work. The father testified that, although both he and the mother scheduled the children's medical appointments, he took the children to their appointments.

According to the son, in 2022, prior to the parties' separation, the mother, the father, the son, and the daughter all lived together in Calera, and both children attended school there. The son testified that he was in the "gifted-education program" at his school.

The mother testified that the parties separated in August 2022 when she filed a petition for a Protection From Abuse ("PFA") order against the father. The mother explained that she filed the petition

> "because he was manipulating the kids against me. [H]e started carrying weapons around the house while I was taking pictures. He would take my kids away from me to other people's houses where I didn't know where they were. He would hide food and different stuff. Sometime[s] he would put me out the house. I had filed a police report where he had slammed my hand up in the door. It was just a lot of mental and physical abuse going on."

The father specifically denied each of those allegations. He also testified that, although he owned a gun in July 2022, he kept the gun in his vehicle. He further testified that he had never shown the gun to the

3

children and had never brandished the gun or used it to threaten the mother or the children.

On August 4, 2022, based on the mother's petition for a PFA order, the trial court entered an ex parte order granting the mother temporary custody of the children and enjoining the father from contacting the mother or the children. According to the son, at that time, the father moved out of the parties' marital home.

On August 11, 2022, the father filed in the trial court a complaint seeking a divorce from the mother. The trial court consolidated the mother's pending PFA action with the divorce action. The mother stated that she eventually agreed to dismiss the PFA action because she thought that the father was no longer a threat after he moved out of the marital home.

The father testified that he did not see the children during the month of August 2022 after he moved out of the marital home. On August 25, 2022, the father filed a motion for pendente lite custody of the children and for pendente lite use and occupancy of the marital home. On that same day, the mother answered the father's divorce complaint; she also filed a counterclaim that asserted abuse by the father as an

alternative ground for divorce and requested, among other things, "physical and legal custody" of the children[1] or, in the alternative, joint legal custody and "primary physical custod[y]."[2]

On September 12, 2022, the mother responded to the father's motion for pendente lite relief, arguing that it was in the children's best interests to remain in her custody, as they had been since the entry of the PFA order, because the father worked a night-shift job five to six nights per week. The mother also requested child support and exclusive use and possession of the marital home. The father testified that he had not seen the children during the month of September 2022.

On September 13, 2022, the trial court held a hearing at which it considered the father's motion for pendente lite relief. At the hearing, the parties entered into a pendente lite agreement ("the September 2022

---

[1]We interpret the request for "physical and legal custody" to be a request for sole physical custody and sole legal custody. Ala. Code 1975, § 30-3-151(4) and (5).

[2]We interpret the request for "primary physical custody" to be a request for sole physical custody. Ala. Code 1975, § 30-3-151(5).

pendente lite agreement").[3]    The September 2022 pendente lite agreement stated, in pertinent part:

> "The wife shall continue to have exclusive use and possession of the marital residence until the [father's] work schedule changes to day shifts, at which point the parties shall rotate week on/week off, Sunday to Sunday.  Said rotation shall begin on October 2nd at the earliest and shall be contingent upon the [father] providing proof of said change to day shifts."

On September 26, 2022, the mother filed an amended answer and amended counterclaim, which differed from her original counterclaim in that it specifically requested "primary physical and legal custody" of the children[4] and ownership and possession of the marital home and other items of property.  On September 27, 2022, the mother filed a motion for a pendente lite order awarding her custody of the children and exclusive possession of the marital home, awarding the father visitation, and requiring the father to pay child support.

---

[3]As set forth, infra, the trial court later entered an order that adopted and incorporated the September 2022 pendente lite agreement.

[4]We interpret the request for "primary physical and legal custody" to be a request for sole physical custody and sole legal custody.  Ala. Code 1975, § 30-3-151(4) and (5).

The mother testified that, on September 28, 2022, she moved with the children from Calera to the Irondale/Trussville area, approximately 45 minutes away by car, to be closer to her job. The son testified that, after the move, he and the daughter changed schools, which required him to leave the gifted-education program. According to the mother, in October 2022, the daughter began attending an after-school program for girls at her school in Trussville.

The father introduced copies of messages that he testified he sent to the mother via the "My Family Wizard" app in October 2022, January 2023, and April 2023, providing his updated work schedules in accordance with the September 2022 pendente lite agreement. The father testified that, despite his compliance, he did not see the children in August, September, October, or November 2022.

Although the mother initially testified that she could not recall whether the father had seen the children in September, she later testified that the father had seen the children in August, September, October, and November 2022. The mother testified that she had never withheld the children from the father and that the children communicated with the father during the fall of 2022 using their cellular telephones.

7

According to the mother, there was friction between the parties when, on October 2, 2022, the father wanted to begin alternating possession of the marital home every week, as described in the September 2022 pendente lite agreement. According to the mother, the father still wanted to have custody of the children only on his days off from work, rather than every other week as stated in the September 2022 pendente lite agreement. The mother testified that the father desired to alternate possession of the marital home because he had nowhere else to live. The father introduced a message sent by him to the mother on October 3, 2022, explaining that, although it was his week to stay in the marital home, he and the children were staying elsewhere because there were no utilities or furniture in the marital home. The father also introduced a message sent to him by the mother stating that, because she had moved out of the marital home, he was responsible for reconnecting the utilities.

On October 4, 2022, the father responded to the mother's pendente lite motion that had been filed on September 27, 2022, and argued that the September 2022 pendente lite agreement had already addressed each of the mother's requests for relief. He also filed a motion for the trial court to enter a pendente lite order reflecting the September 2022

8

pendente lite agreement. The trial court then entered an order adopting the September 2022 pendente lite agreement. Later that day, the mother filed a motion for the trial court to reconsider that order; however, that motion was denied.

On October 20, 2022, the father filed a motion for the trial court to hold the mother in contempt based on her alleged violation of the court's October 4, 2022, pendente lite order. The father averred that the mother "intentionally denied" him the custodial time to which he was entitled; "abandoned the marital residence and moved, with the minor children, to Trussville"; enrolled the children in a new school without notifying him; provided the school with a copy of the ex parte PFA order that had been rescinded, which resulted in him being disallowed from communicating with the children during school hours; and refused to provide the father with her current address. The father requested an award of pendente lite custody of the children.

In response, on October 25, 2022, the mother averred that the father failed to provide his work schedule; stated that he could not comply with the September 2022 pendente lite agreement because of his work schedule; and violated the September 2022 pendente lite agreement by

9

coming to her house uninvited. The mother stated that the father had her new address. She admitted that she unintentionally provided the ex parte PFA order to the school but stated that she informed the school that the father could communicate with the children. She also stated that she had not denied the father visitation.

The father's motion was heard on November 8, 2022. At the hearing, the parties produced another pendente lite agreement ("the November 2022 pendente lite agreement") setting out a visitation schedule for November 8, 2022, through January 24, 2023, with the handwritten title "Father's PLR visitation schedule." Although the November 2022 pendente lite agreement did not state that the daughter would reside with the mother and that the son would reside with the father, the father's subsequent motions stated that these were additional terms of the agreement and that the agreement established visitation "for the respective parents," not only for the father. The parties requested that the trial court adopt the November 2022 pendente lite agreement as an order of the court. On November 11, 2022, the trial court entered an order adopting the November 2022 pendente lite agreement.

The son testified that, in the fall of 2022, the mother had "pulled a gun" on him. The son provided no further details on that incident because he stated that he had already testified about it at a pretrial hearing. The mother denied that she had ever "pulled a gun" on the son.

The son also testified that the mother had punched him. The mother denied punching the son. The son stated that, after the incident in which he claims the mother punched him, he ran away from the mother's home and telephoned the father. The son testified that, thereafter, he moved in with the father and reentered the gifted-education program at the school in Calera that he had previously attended.

The mother testified that the son ran away because he was defiant and did not want to follow her rules. She testified that she telephoned the police and that the police retrieved the son. She also testified that she asked the police to telephone the father to help deescalate the situation. The mother admitted that, after the son ran away from home, she informed the father that the son previously communicated that he did not want to live with the mother.

11

The father introduced bank statements from January 31, 2022, through March 31, 2023, pertaining to three Wells Fargo accounts. The mother admitted that one of the accounts was labeled: "Account number … 3902 [the daughter's name], a minor, by Katina Holiday." Katina Holiday is the mother's maiden name. Similarly, the mother admitted that one of the accounts was labeled: "Account number … 5076 [the son's name], a minor, by Katina Holiday." However, the mother denied that the savings accounts belonged to the children, testifying, "[t]hose are not my [children's] accounts. I just put their name[s] on [them]." According to the mother, she had "placed [her] kids' name[s] on all [her] accounts." However, the father also introduced bank statements from a Wells Fargo account labeled "Account number … 5215 Katina Holiday."

The mother admitted that she requested that the bank name the two accounts as savings accounts for the children, but she stated that she had done so only to ensure that her children could access the accounts in the event of her death and that she and the father had not discussed placing the children's names on the accounts. The mother testified that the money in the savings accounts was comprised of "insurance money," inheritance from her deceased parents' estates, and a settlement from an

automobile-accident lawsuit in which she was involved; she stated that the father had not deposited any money into those accounts.

The mother admitted that, between the end of July and the end of October 2022, she removed approximately $22,000 from the account ending in 5076, which was in the son's name. The statements admitted into evidence also showed that, at the end of July 2022, the balance of the bank account ending in 3902, which was in the daughter's name, was $24,274.14, and that, at the end of October 2022, the balance of that account was $1,174.33, which is a diminution of $23,099.81.

The mother testified that she donated $67,000 (comprised of the $22,000 from the 5076 account in the son's name and $45,000 from the 5215 account, which was in her name only) "[i]n cash" to "Breast Cancer Awareness" and two churches. There was no testimony given as to how the $23,099.81 that was removed from the account ending in 3902, in the daughter's name, was spent. The mother admitted that she expected the children to attend college one day; she stated that she donated the money despite that expectation because of her anxiety and depression. The mother testified that, now, she takes medication to manage her depression and anxiety.

The father testified that the parties had agreed to put the two savings accounts in the children's names under the mother's name rather than his; however, he stated that his intention was for the children to have the money in those accounts when they graduated. The father also testified that he did not know that the mother had removed any money from the accounts until he heard the mother's testimony at the trial.

On December 12, 2022, the father filed a motion to compel the mother to comply with the November 2022 pendente lite agreement, specifically averring that the mother failed to provide the son with his personal property after he began living with the father. On May 10, 2023, the father filed another motion for pendente lite relief, alleging again that the mother failed to provide the son's personal property; alleging that the mother had failed to cooperate in arranging visitation; and alleging that the mother had left the daughter home alone on more than one occasion. The father's motion was set to be heard at trial.

The father testified that, in May 2023, the daughter telephoned him crying and stating that she was afraid because the mother had left her at home alone. The father testified that that instance was not the first time that he heard from the daughter that she had been left by the mother at

14

home alone. He testified that, after receiving the daughter's call, he telephoned the police and drove to the mother's house. The mother testified that she left the house that day to pick up her laptop from work in order to work from home for the rest of the day and that her neighbor had been watching the daughter. The daughter indeed testified that their neighbor had come to check on her while the mother was away from the home.

The father testified that the day the daughter called him about being home alone was a Friday and that he was scheduled to have the daughter from that day through the following Tuesday; however, he stated that his visitation with the daughter did not begin until that Monday. The mother admitted that she had not allowed the father to have that scheduled visitation with the daughter. She testified that the daughter was afraid after the police came to the house and wanted to stay with the mother. According to the mother, the police "made [the father] leave," but he "returned three times after that." The mother testified that she felt like the father was harassing her. The father admitted that he had gone inside the mother's gated community using the key code that day; however, he stated that he had not entered the

15

mother's apartment, seen the mother in person that day, or threatened the mother.

The daughter testified that, as a result of her telephoning the father that day, the mother had taken away her cellular telephone. The daughter testified, however, that she had still been able to message with the father on her tablet. The mother, on the other hand, denied taking the daughter's cellular telephone and stated that the telephone had been lost. The mother denied having ever prevented the daughter from communicating with the father.

The father testified that, during the week preceding the July 2023 trial, he had two days off from work and asked the mother for a visit with the daughter. Although the mother testified that she had been allowing the children to visit with the father on his days off from work, she admitted that she did not facilitate that particular request and that she did not give the father a reason for her denial of that visitation. The mother testified that she had to visit her sister in the hospital. However, the daughter testified that, although they planned to go to the hospital to visit her aunt, she and the mother had not gone that week because the aunt had not telephoned them.

A trial was held on July 26, 2023. The son testified that he was about to enter the eighth grade. He testified that, since the parents separated, he lived primarily with the father, and that the daughter stayed with the father when the father had time off from work. The son stated that he plays multiple sports at his school and that he is happy in his home.

The son testified that he wants to continue to live with the father and wants to visit the mother "[m]aybe sometimes." He testified that he is uncomfortable with the mother and needs time "to heal." The son also testified that he would be okay with the mother attending his sports games and the other activities in which he is involved. The mother testified that, approximately one week before the trial, the son called her and told her that he would love for her to call him more.

The son testified that he thinks counseling for him and the mother could help and stated that he would be open to counseling. The mother also testified that she would be willing to participate in counseling with the son. The father testified that he, the children, and the mother participated in counseling pursuant to the November 2022 pendente lite agreement. The father testified that, at some point before the trial, the

17

family counselor told him that the counseling had terminated, and the family stopped attending; he stated that he did not know why the counseling ended. He testified that he was willing to continue to participate in counseling alongside the whole family.

The mother ultimately requested to be awarded joint custody of the son, stating that she recognized "that a father can do more with his son than [she] can." The mother testified that, at the time of the trial, she had not seen the son "in nine to ten months." The mother testified that she had not been given access to the son by the father. According to the mother, the father stated in a deposition that he felt that he should not have to force the son to establish a better bond with the mother. The father testified that he had given the son the choice to talk to the mother, telling him, "when [you're] ready, I will be there beside [you]."

The mother testified that the father told the daughter, "you need to come stay with us [i.e., the father and the son] because if you don't come stay with us, then you will never see [the son] again." The daughter testified that she lives more often with the mother than with the father. She testified that she has her own room at the mother's house and that she likes staying with the mother. She further testified that she likes

and wants to continue attending her school in Trussville. The daughter also testified that she wants to continue attending her after-school program regardless of whether she lives with the father or the mother. The daughter stated that she visited "[a] little bit" with the father, but that she did not know the last time that she visited with him. The daughter also testified that, if she continues to live primarily with the mother, she wants to visit with the father more.

According to the daughter, while she was at the father's house, she spent time with the son. She testified that, sometimes, the father left her and the son at home alone while the father was at work. The daughter testified that she and the son get along and that he is a good big brother. The mother testified that the daughter misses the son.

When asked with whom she would choose to live, if given the choice, the daughter first testified that she wants to stay with the father but then stated that she wants to spend equal amounts of time with both parents. The daughter further testified that she had not told the mother that she would like to live with the father because she is "kind of scared." She testified that she is afraid of the mother because of the mother's

19

actions toward the son. The daughter testified that she is not afraid of the father.

The mother ultimately requested to be awarded "primary custody"[5] of the daughter and for visitation with the daughter to be awarded to the father. The mother stated that she feels she is better suited to take care of the daughter because they "share a special bond." The mother testified that she has a good relationship with the daughter. She testified that the daughter is generally obedient and that the daughter "had all As" in school.

The mother explained that, in large part due to the father's work schedule, which is from 6:00 a.m. to 6:00 p.m., requiring him to leave home at 3:00 a.m., the mother is a better nurturer to the daughter than the father. As an example, the mother testified about an incident in which the daughter had returned to the mother from the father's house not wearing underwear.

---

[5]We interpret the request for "primary custody" to be a request for sole legal custody and sole physical custody. Ala. Code 1975, § 30-3-151(4) and (5).

The mother testified that the father had only been visiting with the daughter on his days off of work, which comprised about seven days per month. The mother stated that, despite the parties' agreement to alternate with the children weekly, the father asked to have the children only on the weekends. The mother testified that she is open to the father having more visitation time and that she wants to alternate custody of the children weekly during the summer months.

The mother requested that she be given the opportunity to take the daughter when the father has to work, rather than having the son watch the daughter. Additionally, the mother requested that the trial court order the parties to accommodate the children's extracurricular activities. According to the mother, the father deliberately caused the daughter to miss "many field trips and activities" with her after-school program.

The father testified that, on his days off from work, when he had custody of the daughter, he asked the daughter whether she wanted to attend the after-school program, and she said "no" and that she wanted to spend the rest of the day with the father instead. The father also

testified that he had no objection to the daughter attending the after-school program when and if she wanted to do so.

The father ultimately requested to be awarded sole physical custody of both children. He also stated that he desires the children to have visitation with the mother every weekend or every other weekend and that he is willing to transport the children to those visits. The father also testified that he works from 6:00 a.m. to 5:20 p.m. or 5:30 p.m., which requires him to leave home at 3:30 a.m. on workdays. The father testified that his plan, if he were awarded sole physical custody of both children, was to utilize a babysitter and an after-school program in Calera for the daughter.

The mother testified that she works at a medical rehabilitation facility in Birmingham. She testified that her work hours are 8:00 a.m. until 5:00 p.m., Monday through Friday, and that her work does not prevent her from picking up the daughter from the daughter's activities.

On September 3, 2023, the trial court entered a divorce judgment that, among other things, awarded "custody" of the son to the father,

awarded "custody" of the daughter to the mother,[6] awarded the mother "visitation/physical custody periods" with the son, and awarded the father "visitation/physical custody periods" with the daughter. The court also ordered the parties to "cooperate with each other to effect visitation/physical custody periods with the minor children" but provided visitation schedules for use by the parties if they could not agree upon a schedule. The trial court's schedules would require that the children spend every weekend, every holiday, and all of summer together, alternating living at each parents' home. The judgment also mandated that the family participate in family counseling.[7]

On September 27, 2023, the father filed a timely motion to alter, amend, or vacate the judgment, challenging the sufficiency of the evidence to support the trial court's custody awards. That motion was denied by operation of law 90 days later, on December 26, 2023, pursuant

---

[6]We interpret the awards of "custody" to be awards of sole legal custody and sole physical custody. Ala. Code 1975, § 30-3-151(4) and (5).

[7]The judgment also stated that, "[t]o the extent not[] herein granted, all remaining requests for relief [we]re DENIED." (Capitalization in original.)

23

to Rule 59.1, Ala. R. Civ. P. On February 1, 2024, the father filed a timely notice of appeal.

## Standard of Review

"When a [trial] court makes a custody determination based on ore tenus evidence, its findings in support of that determination are accorded a presumption of correctness on appeal. Ex parte Bryowsky, 676 So. 2d 1322, 1324-26 (Ala. 1996). An appellate court will not reverse the [trial] court's custody judgment 'unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.' Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993)."

J.L.W. v. C.J.P., [Ms. CL-2023-0561, May 17, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024). "[W]hen a [trial] court has not made specific factual findings in support of its judgment, we must presume that the [trial] court made those findings necessary to support its judgment, provided that those findings are supported by the evidence." K.C. v. Jefferson Cnty. Dep't of Hum. Res., 54 So. 3d 407, 413 (Ala. Civ. App. 2010).

## Discussion

On appeal, the father argues that sole physical custody of both children should have been awarded to him and that the mother should

24

have received, if anything, mere visitation with the children.[8] The father argues that the trial court's custody award was erroneous for three reasons: (1) because it separated the children, (2) because the daughter stated that she wanted to live with the father, and (3) because the mother had abused the son.[9] We will address each argument in turn.

---

[8]The father also argues that the property division in the divorce judgment was erroneous; however, his brief fails to cite legal authority in support of that argument, and it is not the responsibility of this court to perform a litigant's legal research. Legal Systems, Inc. v. Hoover, 619 So. 2d 930, 932 (Ala Civ. App. 1993); Lockett v. A.L. Sandlin Lumber Co., 588 So. 2d 889, 890 (Ala. Civ. App. 1991). Rule 28(a)(10), Ala. R. App. P., requires an appellant to set forth "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Therefore, "[t]his court will address only those issues properly presented and for which supporting authority has been cited." D.M. v. Jefferson Cnty. Dep't of Hum. Res., 232 So. 3d 237, 243 (Ala. Civ. App. 2017) (quoting Asam v. Devereaux, 686 So. 2d 1222, 1224 (Ala. Civ. App. 1996)). Based on the foregoing, we will not address the father's argument regarding the property award in the divorce judgment.

[9]We note that the father fails to argue that, under Ala. Code 1975, § 30-3-131, there should have been a presumption against awarding the mother custody based on the evidence of domestic abuse. Therefore, we need not address that presumption in this opinion. See, e.g., Griggs v. Griggs, 304 So. 3d 741, 745 (Ala. Civ. App. 2020) ("We note, however, that the wife did not argue the applicability of Ala. Code 1975, § 30-3-131, until she filed her postjudgment motion. Therefore, the trial court was not required to consider that argument."). Moreover, even if we were to consider that presumption, the mother denied having abused the son,

The father's brief is correct that "Alabama law generally encourages trial courts not to separate siblings." E.F.B. v. L.S.T., 157 So. 3d 917, 925 (Ala. Civ. App. 2014). However, Alabama law no longer requires that a custody judgment separating siblings be supported by a "compelling reason" for doing so. See A.B. v. J.B., 40 So. 3d 723, 729 (Ala. Civ. App. 2009). Instead, the best-interest standard applies. See Steed v. Steed, 877 So. 2d 602, 604 (Ala. Civ. App. 2003) ("When the trial court makes an initial custody determination, neither party is entitled to a presumption in his or her favor, and the 'best interest of the child' standard will generally apply."); see also Ex parte Byars, 794 So. 2d 345, 347 (Ala. 2001).

> "In A.B.[ v. J.B., 40 So. 3d 723 (Ala. Civ. App. 2009)], this court explained that, under Alabama law, 'siblings may be separated if the trial court concludes, based on sufficient evidence in the record, that the separation will serve the best interests of the children at issue.' 40 So. 3d at 729. We have also explained that 'the law more specifically requires a trial court to assess the best interests of each child individually when determining the custody arrangement that best suits

and, under the ore tenus rule, the trial court could have believed the mother's testimony instead of the testimony of the son. See, e.g., Shewbart v. Shewbart, 64 So. 3d 1080, 1089 (Ala. Civ. App. 2010) ("On appeal from ore tenus proceedings, this court presumes that the trial court properly found the facts necessary to support its judgment and prudently exercised its discretion.").

26

the interests of each child.' E.F.B.[ v. L.S.T., 157 So. 3d 917, 925 (Ala. Civ. App. 2014)]."

Russell v. Self, 334 So. 3d 229, 235 (Ala. Civ. App. 2021).

"In making an initial award of custody based on the best interests of the children, a trial court may consider factors such as the '"characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between each child and each parent."' Graham v. Graham, 640 So. 2d 963, 964 (Ala. Civ. App. 1994) (quoting Ex parte Devine, 398 So. 2d 686, 696-97 (Ala. 1981)). ... Other factors the trial court may consider in making a custody determination include 'the sex and age of the [children], as well as each parent's ability to provide for the [children's] educational, emotional, material, moral, and social needs.' Tims v. Tims, 519 So. 2d 558, 559 (Ala. Civ. App. 1987). The overall focus of the trial court's decision is the best interests and welfare of the children."

Steed, 877 So. 2d at 604.

Today, trial courts must determine whether separating a set of siblings will serve the children's best interests by examining the relevant factors. In weighing the factors, a court should "not focus solely on the biological relationship between the children" but, rather, should focus on "the actual interpersonal relationship between the children and how that relationship will be affected by their separation." K.U. v. J.C., 196 So. 3d 265, 273 (Ala. Civ. App. 2015) (citing Alverson v. Alverson, 28 So. 3d 784,

27

793 (Ala. Civ. App. 2009) (Moore, J., concurring in part and concurring in the result in part)).

In his special writing in <u>Alverson</u>, Judge Moore, joined by Judge Bryan, explained how courts should apply the best-interest standard with a preference for keeping siblings together:

> "[S]iblings may be separated if the trial court concludes, based on sufficient evidence in the record, that the separation will serve the best interests of the children at issue. In making that determination, the trial court should consider the factors traditionally cited by the appellate courts in this state, <u>see</u> <u>Ex parte Devine</u>, 398 So. 2d 686, 696-97 (Ala. 1981), but it should also consider factors such as the interrelationship of the children, the children's ages, the similarity of interests and activities of the children, whether the children previously resided with the custodial parent, the parents' involvement in the children's upbringing, the parents' emotional stability, the parents' previous lack of cooperation regarding visitation, the children's preference, parental agreement providing for siblings to be together frequently, and the location of the parents' residences. … [E]ach case should be decided on its own factual basis and … the decision should ultimately come down to employing that custody arrangement that serves the best interests of all the children involved."

<u>Alverson</u>, 28 So. 3d at 793 (Moore, J., concurring in part and concurring in the result in part). We find Judge Moore's application of the best-interest standard in cases of separated siblings using the factor list proposed in <u>Alverson</u> to be appropriate. Therefore, we hereby adopt those factors. We note, however, that the list of factors is not exhaustive.

28

Turning to the analysis as it applies in the present case, we first address the "characteristics of those seeking custody, including age, character, stability, mental and physical health," the first factor listed in Ex parte Devine, 398 So. 2d 686 (Ala. 1981).[10]  Here, both parents are relatively young and healthy, and both have stable housing and employment.  We note, though, that the father's job requires him to leave in the early morning hours before the children leave for school, whereas the mother's schedule allows her to report to work at 8:00 a.m.

The father specifically argues that the mother is not a suitable custodian because emotional instability caused her to donate $22,000 from the son's savings account.  However, there is no evidence that the mother donated the money from the accounts in her children's names to harm the children's futures; in fact, she testified that she donated a much larger sum from a third account that was in her name only, which tends to show that her donations were not made for the purpose of taking money from the children.  Additionally, although the father testified that the savings accounts were intended for the children's future use,

---

[10]We also note that the parents' emotional stability is a factor listed in Alverson.

29

according to the mother, the children's names were on the accounts only for the purpose of easy accessibility by the children in the event of her death. Although the mother testified that she has suffered from anxiety and depression, she also stated that she takes medication that successfully treats these illnesses.

The father also specifically argues that the mother's history of violence towards the son and the fact that she has left the daughter home alone establish that the mother is not a suitable custodian for the daughter. While the son's testimony that the mother had punched him and had "pulled a gun" on him is concerning, there was conflicting evidence on that point, and the trial court was not bound to accept the son's testimony as true. Moreover, the son also testified that he wished to maintain a relationship with the mother and even increase his contact with her. There was no evidence indicating that any similar incidents had occurred between the mother and the daughter. Likewise, although the father points out that the mother had left the daughter at home alone, according to the mother, there was always someone watching the daughter while the mother was away.

With respect to the interpersonal relationship between each child and each parent, see Ex parte Devine, 398 So. 2d at 696-97, the evidence indicates that the father has a good relationship with both children; on the other hand, the mother has a good relationship with the daughter, but she has a strained relationship with the son. The daughter testified that she fears the mother due to the mother's treatment of the son and stated that she wants to see the father more; however, the daughter also testified that she liked living with the mother. The mother testified that she and the daughter share a special bond. The son testified about negative experiences he had had with the mother, but he also stated that he wants to see the mother more, communicate with her more, and improve their relationship through counseling. The mother also testified that she desires to improve her relationship with the son, but she admitted that the son would be better off living with the father.

We next address the sexes and ages of the children, the similarity of their interests and activities, and the interpersonal relationship between the siblings. See Ex parte Devine, 398 So. 2d at 696-97; Alverson, 28 So. 3d at 793. At the time of the trial, the son was 13 years old, and the daughter was 7 years old. The children lived together up

31

until the parents' separation and appear to have a healthy and beneficial relationship with each other. Although there was little evidence of shared interests and activities, the siblings testified they got along well and enjoyed their time together. According to the mother, the daughter had missed the son since the children were separated.

With respect to whether either parent lacks the capacity or interest to provide for the educational, emotional, material, moral, or social needs of the children, see Ex parte Devine, 398 So. 2d at 696-97, there was evidence, as discussed previously, indicating that the father is required to leave for work at 3:30 a.m., which leaves him unable to personally assist the children in preparing themselves for school. Although the father stated that he could enlist the help of a babysitter in the mornings if he were awarded custody of the daughter, the trial court could have concluded that the father's work schedule would have a greater effect on the daughter, a seven-year-old child, than it would on the son, who is a teenager and can stay at home without a parent present and prepare himself for school independently.

We next consider whether the children previously resided with the custodial parent and the parents' involvement in the children's

upbringing. See Alverson, 28 So. 3d at 793. Here, because this case involves initial awards of custody and the parties were married, the children lived with both parents until the parties' separation. The mother testified that she had been the "involved parent" and that she had been the disciplinarian while the father had been the children's friend. However, the father testified that he had also taken an active role in rearing the children.

We next turn to the parents' cooperation concerning visitation, whether there is parental agreement about allowing the siblings to be together frequently, and the location of the parents' residences. See Alverson, 28 So. 3d at 793. Here, there was abundant evidence indicating that the parties could not cooperate for the sake of visitation. Although there had been several attempts at fashioning a pendente lite visitation agreement, problems with visitation persisted. We note, however, that the trial court provided a mandatory visitation schedule to take effect if the parents fail to agree on a schedule; the default schedule requires that the children spend every weekend, every holiday, and all summer together, alternating living at each parents' home. Therefore, even in the absence of an agreement, there are default provisions providing for

frequent sibling contact. The location of the parents' residences, approximately 45 minutes apart by car, makes it feasible for the children to maintain frequent contact with each other, and both parents expressed their commitment to participate in counseling to aid them in coparenting more effectively.

Finally, we address the children's preferences. See Alverson, 28 So. 3d at 793. "'"The preference of the child, regardless of h[is] age and maturity, is not determinative of the issue of custody but is merely a factor the trial court may consider in reaching its decision."'" Russell v. Self, 334 So. 3d 229, 235 (Ala. Civ. App. 2021) (quoting Bishop v. Knight, 949 So. 2d 160, 166 (Ala. Civ. App. 2006), quoting in turn Glover v. Singleton, 598 So. 2d 995, 996 (Ala. Civ. App. 1992)). With respect to this factor, the father argues that the daughter testified that she preferred to live with the father. We note, however, that the testimony of the daughter, a young child, was equivocal, and she later changed her testimony, stating that she wanted to split her time equally between both parents. The daughter also admitted that her initial preference for the father's home was because of the number of her friends that lived near the father's home. The evidence also indicated that staying with the

34

mother allowed the daughter to continue attending the after-school program near the mother's residence, which the daughter stated she enjoyed.

Conclusion

Considering the foregoing evidence as it relates to the relevant factors, we conclude that there was sufficient evidence that the trial court's judgment awarding custody of the daughter to the mother and custody of the son to the father was in the best interests of the children. We specifically note that the mother testified that she had been the involved parent and that, although her relationship with the son, a teenaged male, was strained, the mother and the young daughter, who are of the same sex, share a special bond. Moreover, we note that the daughter enjoyed living with the mother and attending the after-school program near the mother's residence. Finally, the evidence indicated that the father was unable to care for the daughter in the early morning hours because of his work schedule. Although there was also evidence presented that weighed against the award of custody of the daughter to the mother and against the separation of the siblings, this court will not

reweigh the evidence. Based on the foregoing, we affirm the trial court's judgment.

AFFIRMED.

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.